(No. 11868.—Judgment affirmed.)

FRANK S. BURNS, Plaintiff in Error, *vs.* WILLIAM R. CURRAN *et al.* Defendants in Error.

*Opinion filed February 20, 1918.*

1. LIMITATIONS—*what may constitute possession of property not capable of being improved.* Where property is so situated as not to admit of permanent useful improvements, a continued claim, evidenced by public acts of ownership such as the claimant would exercise over property claimed in his own right and which he would not otherwise exercise, may constitute actual possession.

2. SAME—*what will not constitute an interruption of possession.* The failure in one year or more to pasture land or use it otherwise, occasioned by high water overflowing the land, will not, of itself, necessarily constitute an interruption of the possession.

3. SAME—*purchaser from heir may claim possession with other heirs as co-tenant.* One who purchases the interest of an heir in a tract of land has the right, as a co-tenant with the other heirs, to occupy the common property, and the successive adverse possessions of the several co-tenants may be joined so as to inure to the benefit of all of them in establishing a continuous adverse possession for the period required by the Statute of Limitations.

4. EJECTMENT—*when question of proof of plaintiff's title is unimportant on appeal.* In ejectment, where the case is submitted to the jury on the issue of the twenty year Statute of Limitations, which is found in favor of the defendants on evidence sufficient

to support the verdict, the question of the evidence as to the plaintiff's title is unimportant on appeal.

5. JUDICIAL NOTICE—*court will take judicial notice of boundary of county.* The court will take judicial notice that the Illinois river is the west boundary of Tazewell county and that no lands governed by the fourth principal meridian in the government system of surveying lie east of that river.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. CLYDE E. STONE, Judge, presiding.

KEITHLEY & KEITHLEY, for plaintiff in error.

STEVENS, MILLER & ELLIOTT, WEIL & BARTLEY, and RALPH DEMPSEY, for defendants in error.

Mr. JUSTICE DUNN delivered the opinion of the court:

Upon the remandment of the case of *Burns* v. *Curran,* 275 Ill. 448, a trial was had at the March term, 1917, of the circuit court of Peoria county, which resulted in a verdict of not guilty and a judgment for the defendants, to reverse which the plaintiff has sued out a writ of error.

The plaintiff showed possession, as on the former trial, under the three quit-claim deeds which were introduced in evidence, together with the deed from the county of Peoria which was excluded on the former trial, and the defendants, to meet the *prima facie* case thus made, introduced evidence to establish their defense under the twenty year Statute of Limitations.

The land in controversy is the west half of section 5, town 6, north, range 6, east of the fourth principal meridian. The northwest quarter of the section was sold in 1881 for taxes. A tax deed was made in 1883 to William Stafford, who conveyed the quarter section in 1888 to Joseph Partridge, and he conveyed it to the defendant in error William R. Curran on March 18, 1892. A tax deed of the fractional southwest quarter of section 5 was made to F. L. Fiske on June 30, 1887, based on a sale for taxes made in 1885. Two days later Fiske conveyed to S. W.

Freeman, who on October 8, 1888, conveyed to Alexander Partridge. Alexander Partridge died leaving a widow, four sons, two daughters and two grandchildren as his heirs. Joseph Partridge was one of the heirs, and his deed of March 18, 1892, to W. R. Curran conveyed also his undivided one-seventh interest in the southwest fractional quarter of section 5 as an heir of Alexander Partridge. The widow and the other adult heirs before the spring of 1895 contracted to convey their interest in the southwest quarter to the defendants in error W. R. Curran, Joseph V. Graff and M. H. Gollon, and subsequently, in 1897 and 1899, did make such conveyances. One of the grandchildren was a minor, whose father agreed for him that he would convey his interest upon reaching his majority, and he did convey it to Curran on June 30, 1915, a few days after this action was begun. Joseph Partridge was in possession of the northwest quarter and lived on it for two or three years before he conveyed to Curran. There was a clearing of about fifteen acres surrounded by a wire fence, on which were a house and a stable. After the conveyance he moved off. The plaintiff in error's possession of the land in 1894 was transitory. On April 23 of that year he went to the land with Andrew Wood, who lived about a mile and a half from it, leased it to him verbally, hired him to make two inclosures, bought some barbed wire and gave it to him. He never saw Wood again until two or three years afterward and never saw the land again until 1896 or 1897. Wood and his son removed some brush, driftwood and logs, planted some corn, (about five acres in the clearing,) made a fence to inclose the corn, principally of brush, though they used the wire as far as it would go. No one lived on the land. Wood occupied only the land planted in corn, and that only until the crop was gathered in the fall, when he hauled it off to where he lived. After 1894 the plaintiff in error was on the land twice between 1896 and 1900, and not again until March 30, 1916. In March, 1895,

Curran caused a fence to be constructed inclosing the land in controversy. The land is on the west bank of the Illinois river. The fence, which was of three wires fastened to oak posts set sixteen feet apart, began at the river at the southwest corner of section 5, and extended north along the west line of the section nearly a mile, thence west, north, east and south, including other lands, and returning to the river, so that the fence and the river completely surrounded the lands in controversy. The inclosure also included a large quantity of other lands belonging to Curran, Graff and Gollon and one eighty-acre tract of which they did not then have the title but for which they were negotiating and the title of which they did later acquire.

It is insisted on behalf of the plaintiff in error that the adverse possession which would bar the legal title must be actual, adverse, visible, notorious, exclusive, continuous and under claim or color of title, and that the defendants in error's possession has lacked each one of these qualities during some part of the twenty-year period before the commencement of the suit.

After the building of the fence in the spring of 1895 Graff and Curran entered into a contract for the placing of a saw-mill on the premises and the manufacture of lumber from the timber growing on them, under which a large amount of lumber was cut from the premises and sawed. The land was also used for the purpose of pasturing cattle under the authority of Graff and Curran, and corn was raised on a part of it. The land had always been subject to overflow, and since the waters of the Sanitary District of Chicago were turned into the Illinois river, in 1900, the overflow has been much greater and at times the land has been entirely submerged. It has not been cultivated since that time, but the pasturing of the land has continued, except in seasons when the high water has prevented. Graff and Curran sued the Sanitary District of Chicago for damages done this land by overflowing it and recovered a judg-

ment. In March, 1908, Curran leased to George Sonne-maker and Bert Robbins the exclusive right of taking fish, game and fur-bearing animals from Scott lake, Murray lake and Slim lake and the overflow water connected with said bodies of water and located on the premises in controversy, requiring the lessees to report to him the names of all persons trespassing on the premises or violating any of the rights granted by the lease, and at the expiration of the lease, on March 1, 1913, another lease to the same effect was made to Sonnemaker for a year. The lessees under these leases occupied the land for the purpose of fishing and trapping. They fished with nets and seines, using three posts to set each net and a stake for each trap. The stakes were ten or twelve feet long and would extend four or five feet above the water and when the water was high would sometimes be entirely under water. While they were occupying the land under their leases they filed two bills in chancery enjoining fishermen from trespassing on the land leased to them, and obtained decrees enjoining defendants from trespassing on the premises or taking fish, game or fur-bearing animals from the waters thereon.

The plaintiff in error insists that land covered by water can be held adversely only when inclosed by a fence, dam, wall or weir, but we held differently in *LeSourd* v. *Edwards,* 236 Ill. 169. Neither actual occupancy, cultivation nor residence is necessary to constitute actual possession of land. Where property is so situated as not to admit of permanent useful improvements, the continued claim of the party, evidenced by public acts of ownership such as he would exercise over property which he claimed in his own right and would not exercise over property which he did not claim, may constitute actual possession. (*Morrison* v. *Kelly,* 22 Ill. 609; *LeSourd* v. *Edwards, supra.*) The inclosing of the land with a fence, the cutting and sawing of timber and the cultivation of parts of the land until the overflow caused by the sanitary district prevented cul-

tivation, the pasturing of the land each year, the setting of traps and nets and driving of stakes to which they were fastened, were all circumstances to be considered in determining the question of actual possession, which it was the province of the jury to pass upon. The failure in one year or more to pasture the land or to use it otherwise, occasioned by high water overflowing the land, would not, of itself, necessarily constitute an interruption of the possession. *Downing* v. *Mayes*, 153 Ill. 330.

The fact that in the tract with the land in controversy were included several hundred acres of other land of the defendant in error Curran does not affect the question of his possession, nor does the fact that there were also included eighty acres of which he did not have the title. He was negotiating for the title at the time, and the taking possession of the tract before obtaining the title did not interfere with his actual possession of the other lands inclosed.

The plaintiff in error insists that the possession of Curran was not adverse, because when he acquired his possession he had no title but only a deed to an undivided seventh of the southwest quarter and was negotiating for the remaining interests, acquiring them from time to time and not completing the acquisition of them until after the commencement of this action. Furthermore, it appears that M. H. Gollon and Joseph V. Graff were equally interested with Curran in the premises or a part of them. It is therefore argued that Curran's possession was not adverse as to all the world and did not constitute a claim of ownership of the land in fee but was subordinate to the rights of Gollon and Graff and the heirs of Alexander Partridge. By virtue of the deed from Joseph Partridge, Curran became a tenant in common with the other heirs of Alexander Partridge. His entry and possession were their entry and possession. He and they were both entitled to the benefit of that possession and their possession was adverse to all the world. Every tenant in common has the right to enter into

282 – 31

and occupy the common property and every part of it, and the possession taken and held by any co-tenant is the possession of all the co-tenants. Successive adverse possessions held under color of title by several co-tenants may be joined together so as to inure to the benefit of all of them in establishing a continuous adverse possession for the period of the Statute of Limitations. (*Woodruff* v. *Roysden,* 105 Tenn. 491.) The evidence shows that before taking possession Curran had contracted with the heirs of Alexander Partridge for a conveyance of the southwest quarter, and they later conveyed it to him. One of them was a minor, whose father contracted on his behalf, and he subsequently ratified and performed the contract. Curran had a right to rely upon his possession as the possession of all the property by all the co-tenants adverse to all the world.

Objections are made to the giving of two instructions and the refusal of two, but in view of what has already been said they need not be discussed.

It is insisted that the deed of Joseph Partridge to Curran did not constitute color of title because it described the property as situated in Tazewell county. The property was described as part of section 5, township 6, north, range 6, east of the fourth principal meridian. Only one section in the State answers that description and it is in Peoria county. We take judicial notice that the Illinois river is the west boundary of Tazewell county and that no lands governed by the fourth principal meridian in the government system of surveying lie east of that river. The question of the evidence in support of the plaintiff in error's title is unimportant, since the cause was submitted to the jury on the issue of the twenty year Statute of Limitations, which was found in favor of the defendants on evidence sufficient to sustain the verdict.

The judgment will be affirmed.    *Judgment affirmed.*