ESTATE OF EDWARD WELLIVER, Deceased, by Barry Welliver, as Ex'r of the Estate of Edward Welliver, *et al.*, Plaintiffs and Counterdefendants-Appellees, v. CHAREL S. ALBERTS, Defendant and Counterplaintiff-Appellant (Unknown Owners and Nonrecord Claimants, Defendants).

Second District   No. 2—95—0742

Opinion filed April 3, 1996.—Rehearing denied May 8, 1996.

G. Michael Scheurich, of Guyer & Enichen, P.C., of Rockford, and Clifford E. Lund, of Elgin, for appellant.

William E. Schirger and David F. Monteleone, both of Schirger & Monteleone, of Rockford, for appellees.

PRESIDING JUSTICE McLAREN delivered the opinion of the court:

The plaintiffs, Barry Welliver, as executor of the estate of Edward Welliver, and Deborah Siebold, as the successor in interest, heir, and beneficiary of Edward Welliver, brought this action to quiet and confirm title to a parcel of land. The plaintiffs claimed title to the property through adverse possession. See 735 ILCS 5/13—101 (West 1994). The defendant, Charel Alberts, who held record title to the disputed property, filed a countercomplaint to quiet title and for ejectment. After a bench trial, the trial court found the Wellivers had acquired title through adverse possession to the bulk of the disputed area, namely, the "woods." The court set the boundary line

at the line set forth in an utility easement granted Central Illinois Electric and Gas Company. Further, the trial court granted the plaintiffs an easement by implication, encompassing an access road which traversed the disputed property. We reverse.

The rough diagram appearing below will assist in an understanding of the facts.

On February 10, 1964, Ed and Pauline Welliver acquired two separate parcels of land. The first, labeled as property A on the diagram, was conveyed by Lowell and Ruth Baxter, consisted of approximately 18 acres, was located on the Kishwaukee River, and was intended to be the site for the Welliver home. The second, labeled as property B, was conveyed by John and Estella Baxter, consisted of a 50-foot strip of property, approximately 2,652 feet long, which connected property A with Rotary Road, to the south of property A and the river, and was intended to be the site for a private road to the Welliver home. However, the record reveals that Ed and Pauline Welliver could not lay the entire road on property B, as they had intended, due to the topographical features of property B.

As a result of the road problem, Ed and Pauline Welliver bought a third parcel, property C, from John and Estella Baxter in June 1964. Property C was approximately 610 feet, east to west, and adjoined property A to the south and property B to the east. The land in dispute lies adjacent to the south boundary of property C and the east boundary of property B and was included in the legal description of the property purchased by the defendant in May 1993. On August 12, 1964, Edward Welliver gave Central Illinois Electric and Gas Company an utility easement over the disputed property.

The defendant's grantors, Troy and Erma Venable and J.B. and Jewell Bowling, acquired their parcel from the Baxter family by an alleged agreement for deed in 1974 and, subsequently, a warranty deed in 1984.

During the summer of 1993, the defendant began erecting a fence on her parcel 5 to 10 feet south of the line of trees which demarcated the "woods." The defendant was informed by Siebold that the defendant was on the Wellivers' land and that the property line was approximately 100 yards south of the edge of the woods. In September 1993, the defendant was barred from using the private road on the Wellivers' access strip. The instant action commenced shortly thereafter.

At trial, the plaintiffs argued that they had gained title, through adverse possession, to the "woods," as well as property up to 40 feet south of the "woods." The daughter of John and Estella Baxter testified for the plaintiffs that, despite the legal description of the deeds, there was never any dispute between her parents and the Wellivers that the boundary line between the properties was "[a]bout 3 feet south of the wood line." Further, the plaintiffs presented testimony and evidence that in 1964 and 1965, Ed Welliver ran his tractor through the "woods" to create trails on the property at issue. The Wellivers presented testimony regarding their maintenance of the

trails, which involved snipping away encroaching vegetation. The plaintiffs also testified as to their use of the trails for walking, horseback riding, cycling, and snowmobiling, and the "woods" for camping. In addition, the plaintiffs presented testimony that a motorcycle group obtained the Wellivers' permission to hold a motorcycle endurance race on the trails one day a year. The plaintiffs also presented testimony that Ed Welliver posted a "No Hunting" sign at the edge of the "woods" on the disputed property, but the defendant presented testimony that the "No Hunting" sign was not erected until after the present dispute over the boundary line had commenced. Further, the plaintiffs presented testimony that, following Ed Welliver's death, they spread his ashes throughout the woodland trails.

With regard to the portion of the road which traversed the northwest corner of the defendant's deeded property, the plaintiffs presented testimony that the road was "put in" in 1964 and that the reason a portion of it juts across the defendant's land is because in 1964, the Wellivers could not put a road from Rotary Drive the entire length of their access strip to their residence, going straight north, because of the existence of a gully. Thus, they had to curve the road to the east at that point.

Testimony supporting the defendant's arguments was also heard in the trial. J.B. Bowling, the defendant's grantor, testified for the defendant that he farmed the field "all of the way up to the woods." Also, J.B. Bowling testified that the motorcycle group approached him twice about the endurance race to obtain his permission and that he had no knowledge that they had staged the race more than those two occasions. J.B. Bowling stated that he had granted permission to two other individuals to use the "woods" for motorcycling. Further, J.B. Bowling testified that, in the spring of 1976, Ed Welliver asserted a claim of ownership to a substantial portion, perhaps as much as 339 feet, of the northern part of the land which Bowling was then farming. Bowling testified that he responded by threatening to bulldoze the portion of the Welliver access road which lay within the disputed parcel of land and rip out the power line from the same area. After Bowling went back to his residence to recharge the battery on his "[C]aterpillar," Bowling testified that Ed Welliver, driving his lawn tractor, approached Bowling and the two of them had another discussion. Bowling stated that he and Ed Welliver came to a resolution to their heated argument, whereby Ed Welliver was allowed to continue use of Bowling land for the roadway and power line in return for the Bowlings' use of the Welliver roadway on the Welliver family's access strip. J.B. Bowling testified that he agreed to

Welliver using, but not owning, the Bowling land on which the roadway and power lines were located. J.B. Bowling and Ed Welliver then shared a bottle of wine to celebrate their agreement. Jackie Bowling and Larry Bowling, J.B. Bowling's sons, were present during the conversation between their father and Ed Welliver and testified as to similar recollections of the event during their evidence depositions. Joel Bowling, another of J.B. Bowling's sons, also confirmed, by testifying at trial, the discussion and agreement between his father and Ed Welliver. Also, Joel Bowling testified that he used the "woods" for hunting, camping, motorcycling, and snowmobiling while his family owned the property. On one occasion in 1981, Joel testified that Ed Welliver, who was opposed to hunting, encountered Joel in the "woods" on the disputed property while Joel was hunting. Welliver advised Joel that Welliver did not want Joel hunting on Welliver property. Joel Bowling informed Welliver that they were not on Welliver land. Ed Welliver then retorted that they could call the police if they had to sort it out. Joel did not leave his hunting perch, but Ed Welliver left the premises.

In addition to the Bowling family's testimony, the defendant herself, along with her fiancé, testified with regard to her actions after buying the property from J.B. Bowling. The defendant testified that, after she had bought the property, she noticed the woodland trails but did not believe that their presence signified that one of her neighbors would assert ownership rights to that portion of her property which included the "woods." In addition, Arthur Johnson, the defendant's fiancé, testified that, after Alberts had purchased the property, he had a conversation with Steve and Deborah Siebold, in which he stated that he and Alberts "understood there was an agreement on the road," and the Siebolds agreed that "they would be willing to continue that agreement." Johnson also testified that he met with the Siebolds a second time, this time with Barry Welliver present. Johnson testified that Barry Welliver knew that the road came across Alberts' property and also that all of the parties at the meeting also knew that there was a verbal agreement between Ed Welliver and J.B. Bowling. Johnson testified that all the parties at that meeting expressed a willingness to continue to be bound by such agreement.

■ Initially, before we enter our discussion on adverse possession, we note that, on appeal, the defendant argues that the testimony of J.B. Bowling should not have been barred by the Dead-Man's Act (735 ILCS 5/8—201 (West 1994)). The plaintiffs, in their brief before this court, argue that the question to which the Dead-Man's Act objection was sustained was withdrawn. Neither party is correct. The

record clearly reveals that J.B. Bowling's testimony was, in fact, allowed into evidence by the trial court. Thus, the defendant has no need to raise the trial court's ruling on the Dead-Man's Act in this appeal. Whether the trial court correctly found that the plaintiffs had sustained their burden regarding adverse possession, in light of J.B. Bowling's testimony, is a separate issue. In addition, our reading of the trial court proceedings indicates that, after withdrawing previous questions at the trial court's urging so that the trial court would "know what you [counsel for the defendant] are talking about," presumably to help the trial court respond to the plaintiffs' objections, counsel for the defendant asked J.B. Bowling:

"Mr. Bowling, did you ever threaten to Ed Welliver that you would take your [C]aterpillar and plow up the portion of the roadway that lies on the northwest corner of the land you bought from *** Cook, Baxter, Cook and Baxter?"

The plaintiffs objected to the question on the grounds of the Dead-Man's Act (735 ILCS 5/8—201 (West 1994)) and hearsay. However, the trial court overruled the objection by finding that the plaintiffs had waived their objections. Because the plaintiffs have not filed a cross-appeal on this ruling and did not obtain title by adverse possession over all of the land which they sought, we are not at liberty to review this decision of the trial court. See *Landmarks Preservation Council v. City of Chicago*, 125 Ill. 2d 164, 174 (1988); *Fillpot v. Midway Airlines, Inc.*, 261 Ill. App. 3d 237, 240 (1994). Further, by failing to present their argument that an answer to the above question, and the questions which followed, should have been barred by the Dead-Man's Act (735 ILCS 5/8—201 (West 1994)), the plaintiffs waived their argument in this appeal (*Kubian v. Alexian Brothers Medical Center*, 272 Ill. App. 3d 246, 256 (1995); *Manisca v. Rakstang Associates, Inc.*, 256 Ill. App. 3d 756, 761 (1993)). Thus, the record we review for this appeal includes the testimony of J.B. Bowling, as well as the testimony of J.B. Bowling's sons, regarding the alleged confrontation and subsequent agreement between J.B. Bowling and Ed Welliver.

## ADVERSE POSSESSION

■ To establish title under the adverse possession doctrine incorporated in section 13—101 of the limitations act (735 ILCS 5/13—101 (West 1994)), the asserted adverse possessors must possess the disputed land for 20 years. Further, the 20 years of possession must also, concurrently, have been: (1) continuous; (2) hostile or adverse; (3) actual; (4) open, notorious, and exclusive; and (5) under claim of title inconsistent with that of the true owner. *Joiner v. Janssen*, 85 Ill. 2d 74, 81 (1981). Further, because the possession must be

of a "definitely defined tract" (*Schwartz v. Piper*, 4 Ill. 2d 488, 493 (1954)), where a boundary line is in dispute, an adverse possessor "bears the burden of establishing by clear and convincing proof the location of the boundary" (*Joiner*, 85 Ill. 2d at 83). Moreover, "[m]ere permission to use land cannot ripen into a prescriptive right." *Mueller v. Keller*, 18 Ill. 2d 334, 340 (1960); see also *Cobb v. Nagele*, 242 Ill. App. 3d 975, 979 (1993). All presumptions are in favor of the title owner, and "the burden of proof upon the adverse possessor requires that each element be proved by clear and unequivocal evidence." *Joiner*, 85 Ill. 2d at 81. Because our supreme court has never detailed a "clear and unequivocal" standard, courts have applied the "clear and convincing" burden of proof in adverse possession cases. See, *e.g.*, *Sierens v. Frankenreider*, 259 Ill. App. 3d 293, 298 (1994). On review, a court will not disturb the findings of a trial court as to the proof of these elements unless the findings are against the manifest weight of the evidence. *Sierens*, 259 Ill. App. 3d at 296.

In the present case, we find that the trial court's decision that the plaintiffs proved, by clear and convincing evidence, that their possession was: (1) actual; and (2) open, notorious, and exclusive (see *Joiner*, 85 Ill. 2d at 83) is against the manifest weight of the evidence.

■ Our supreme court, when discussing the elements of an adverse possession claim, ruled that " 'improvements or acts of dominion over the land as will indicate to persons residing in the immediate neighborhood who has the exclusive management and control of the land are sufficient to constitute possession.' " *Joiner*, 85 Ill. 2d at 82, quoting *Augustus v. Lydig*, 353 Ill. 215, 221-22 (1933). For purposes of the "actual" requirement to adverse possession, the relevant portion of the above statement is that the plaintiffs must prove that they made "improvements or [performed] acts of dominion" (*Joiner*, 85 Ill. 2d at 82) sufficient to "provide the reasonably diligent owner with visible evidence of another's exercise of dominion and control" (*Nome 2000 v. Fagerstrom*, 799 P.2d 304, 311 (Alaska 1990)). The law of this state is clear that "[t]he possession necessary to constitute adverse possession is not required to be fuller than the character of the land admits." *McMillin v. Economics Laboratory, Inc.*, 127 Ill. App. 3d 517, 523 (1984); see also *Chicago Title & Trust Co. v. Darley*, 363 Ill. 197, 202 (1936). However, courts have determined that, while the intent to take control of wild and undeveloped land requires a lesser exercise of actual ownership by affirmative act than with other property, the actual ownership must still be more than " 'mere mental enclosure.' " *Berryhill v. Moore*, 180 Ariz. 77, 86, 881 P.2d 1182, 1191 (Ariz. App. 1994), quoting *Edmonds v. Thurman*, 808 S.W.2d 408, 410 (Mo. App. 1991).

■ We determine that the plaintiffs' acts in the present case were insufficient, as a matter of law, to satisfy the "actual" requirement of the adverse possession doctrine. The record indicates that Ed Welliver originally formed the trails through the "woods," the Wellivers maintained the trails by snipping away encroaching vegetation, the Wellivers used the trails for recreational purposes and gave permission to a motorcycle group to use the trails once a year. However, the record also indicates that the defendant's grantor may have also given permission to the motorcycle group. Moreover, the Wellivers never fenced any part of the property they believed was theirs; improvements were never built upon the property, other than a campfire site which Joel Bowling testified that he had originally created; and some testimony indicated that Ed Welliver, who was opposed to hunting, did not deny hunters access to the disputed property. Further, it is well established that use of vacant, or wild and undeveloped and unoccupied land is presumed to be permissive and not adverse. *Monroe v. Shrake*, 376 Ill. 253, 256 (1941); *Parker v. Rosenberg*, 317 Ill. 511, 517 (1925). Thus, mere use of the trails for recreational purposes through the woods located on the Bowlings' land does not constitute clear and convincing evidence of dominion to "provide the reasonably diligent owner with visible evidence of another's exercise of dominion and control." *Nome 2000*, 799 P.2d at 311.

Analysis of the case law lends further support to our determination in this matter. While we are not bound by a decision from one of our sister states (*Kus v. Sherman Hospital*, 268 Ill. App. 3d 771, 779-80 (1995)), we find one case particularly enlightening. In *Nome 2000*, the Supreme Court of Alaska determined that adverse possessors did not satisfy the "actual" requirement to the adverse possession doctrine with regard to a portion of land where the adverse possessors' only activities were using the trails for recreational activities and picking berries, as well as maintaining the trails by picking up litter located thereon. *Nome 2000*, 799 P.2d at 311.

Illinois cases that the plaintiffs cited in this regard are distinguishable. In *Burns v. Curran*, 282 Ill. 476 (1918), our supreme court affirmed the granting of title by adverse possession where land, enclosed by a fence, was used for the placing of a sawmill, pasturing cattle, and growing corn. The land was subjected to water overflows, at times being completely submerged, during which time the adverse possessors could not saw, allow animals to graze, or farm. While *Burns* stated that "[n]either actual occupancy, cultivation nor residence is necessary to constitute actual possession of land" (*Burns*, 282 Ill. at 480), the court was primarily concerned with whether the

possession in that case was continuous. The fencing of the property, the improvement of the saw mill, and the uses for grazing and farming combined, as a whole, sufficiently to provide the reasonably diligent owner with visible evidence of another's exercise of dominion and control. *Nome 2000*, 799 P.2d at 311. In the present case, the use and improvements did not rise to such a level.

Similarly, in *McMillin v. Economics Laboratory, Inc.*, 127 Ill. App. 3d 517 (1984), the Appellate Court, Third District, affirmed the granting of title by adverse possession where the adverse possessor's use and improvements upon the disputed parcel were sufficient to satisfy the "actual" requirement of the doctrine. In *McMillin*, out-of-state residents only visited the disputed property annually, but posted "No Trespassing" signs; barred the only entrance to the disputed property with a steel cable; granted, for consideration, a year's use of the property to a business; granted, for consideration, a pipeline easement to a different company; and paid the real estate taxes on the property. *McMillin*, 127 Ill. App. 3d at 520-21. In the present case, the Wellivers' use and improvements of the "woods" did not rise to such a level.

Assuming *arguendo* that the plaintiffs satisfied the "actual" requirement of the doctrine of adverse possession, the trial court's decision is still against the manifest weight of the evidence. The plaintiffs did not prove, by clear and convincing evidence, that their possession of the "woods" was open, notorious, and exclusive. See *Joiner*, 85 Ill. 2d at 83. Our supreme court stated that the adverse possessor's actual possession must "indicate to persons residing in the immediate neighborhood who has the exclusive management and control of the land." *Joiner*, 85 Ill. 2d at 82. It must also "be of such open and visible character as to apprise the world, that the property has been appropriated, and is occupied." *Travers v. McElvain*, 181 Ill. 382, 387 (1899). The adverse possessor must figuratively " 'unfurl his flag on the land, and keep it flying.' " *Moran v. Byrne*, 149 Vt. 353, 355, 543 A.2d 262, 263 (1988), quoting *Barrell v. Renehan*, 114 Vt. 23, 29, 39 A.2d 330, 333 (1944).

In the instant case, we determine that the plaintiffs' maintenance and recreational use of the trails does not sufficiently establish their asserted dominion over the "woods" to the defendant or her grantors, much less the persons in the immediate neighborhood, especially in light of the presumption of permissive use of wild and undeveloped land. *Monroe*, 376 Ill. at 256. While the plaintiffs presented evidence that the Wellivers gave permission for the motorcycle race, the defendant also presented testimony from J.B. Bowling that he, too, gave the motorcycle group his permission. Further, the fact

that Ed Welliver granted a utility easement over the contested property to a gas and electric company does not satisfy the open and notorious requirement. It is well established that constructive notice of encumbrances or conveyances arises only when the encumbrances are in the direct chain of title. *Greer v. Carter Oil Co.*, 373 Ill. 168, 173 (1940); *Hillblom v. Ivancsits*, 76 Ill. App. 3d 306, 311 (1979). Thus, the plaintiffs failed to prove clearly and convincingly that their use of the "woods" was open and notorious.

■ Moreover, we determine that it is against the manifest weight of the evidence to find that the plaintiffs proved, by clear and convincing evidence, that they had exclusive use of the woods during their alleged possession. Our supreme court has commented that "[t]he [adverse] occupancy must be exclusive. If the possession is only used and enjoyed in common with others, or the public in general, it cannot be regarded as hostile to other persons claiming title." *Travers*, 181 Ill. at 387. While this language blends two of the adverse possession elements (see *Joiner*, 85 Ill. 2d at 81), it, nonetheless, clearly finds application in the case at bar. While courts in Illinois have not had further occasion to discuss the exclusive requirement of the adverse possession doctrine, other courts have found it to be necessary because "[i]t is evident that two or more persons cannot hold one tract of land adversely to each other at the same time." *Marengo Cave Co. v. Ross*, 212 Ind. 624, 633, 10 N.E.2d 917, 921 (1937). Furthermore:

> "The rightful owner cannot be deprived of his title by the possession of another, although such other person clams [*sic*] to own it, if the rightful owner is also in possession during the same time the adverse claimant is in possession. Any sort of joint possession with the owner is not sufficient to support title by adverse possession. *The owner must be wholly excluded from possession by such claimant for the stated period.*" (Emphasis added.) *Fiorella v. Jones*, 259 S.W. 782, 785 (Mo. 1923).

We agree with the *Fiorella* court insofar as the nature and extent of the exclusion evidences open and notorious possession. In the present case, the defendant presented the testimony of Joel Bowling, the son of the defendant's grantor. Joel Bowling testified that he used the "woods" for hunting, camping, motorcycling, and snowmobiling. Joel further testified that when Ed Welliver, who did not approve of hunting, discovered Joel hunting on the disputed property, Ed did not make Joel leave. Barry Welliver admitted, during the plaintiffs' rebuttal case, that Joel Bowling "periodically" drove a motorcycle through the "woods," and Diane Wright, daughter to Ed Welliver, also admitted, during the plaintiffs' rebuttal case, that Joel Bowling

would "periodically" go through the "woods" on a motorcycle. In light of this evidence, the plaintiffs clearly did not satisfy their burden on the exclusive requirement of the doctrine of adverse possession with regard to the "woods."

In addition, we find that the plaintiffs did not sufficiently prove the location of the boundary of the land to which they laid claim. "In a case where an adverse possessor is claiming to a mistaken or disputed boundary[,] he bears the burden of establishing[,] by clear and convincing proof[,] the location of the boundary." *Joiner*, 85 Ill. 2d at 83. In the present case, the plaintiffs' witnesses did not agree amongst themselves about the position of the boundary. Their estimates ranged from "roughly a few feet into the field" to 40 feet south of the woodline. The boundary line eventually chosen by the court, located to the north of the tree line, was *not* advocated by any of the plaintiffs' witnesses. Clearly, the plaintiffs did not sufficiently establish the location of the disputed boundary.

## IMPLIED EASEMENT

█ Initially, we note that the trial court did not grant the plaintiffs title by adverse possession to that portion of the defendant's land on which the plaintiffs have built a road. Our supreme court has stated, "The evidence of adverse possession cannot consist of mere acts of trespass or *permissive acts*." (Emphasis added.) *Duck Island Hunting & Fishing Club v. Whitnah*, 306 Ill. 284, 291 (1922). In light of the evidence on the existence of an agreement between J.B. Bowling and Ed Welliver regarding the Welliver use of the road, the trial court correctly ruled that the plaintiffs did not establish by clear and convincing evidence their right to acquire title to the land on which the road is located.

The implied easement which the trial court did grant the plaintiffs for that portion of the Wellivers' access road was not specifically requested in the plaintiffs' amended complaint (nor was any easement set forth in the pleadings). As this court has previously stated, " '[p]roof without pleadings is as defective as pleadings without proof.' " *Keno & Sons Construction Co. v. La Salle National Bank*, 214 Ill. App. 3d 310, 312 (1991), quoting *Greene v. Rogers*, 147 Ill. App. 3d 1009, 1021 (1986).

Furthermore, while the plaintiffs did not include the relief of a prescriptive easement in their complaint, their counsel argued for this relief during closing argument, and the trial court correctly denied the plaintiffs this avenue of relief. The right to a prescriptive easement, just like the right to acquire title by adverse possession, does not arise from permissive acts. *Mueller*, 18 Ill. 2d at 341; see also

*Cobb*, 242 Ill. App. 3d at 979. In light of the evidence regarding an agreement on the Welliver access road, the plaintiffs did not prove that they were entitled to a prescriptive easement by clear and convincing evidence.

Instead, the trial court granted the plaintiffs an implied easement. There are two types of implied easements: the easement by necessity and the easement implied from a preexisting use. *Granite Properties Limited Partnership v. Manns*, 117 Ill. 2d 425, 435 (1987); *Martin v. See*, 232 Ill. App. 3d 968, 977 (1992). The trial court did not specify which type of implied easement it was granting the plaintiffs. However, one of the elements required for establishing an easement implied from a preexisting use is:

"[B]efore the separation [of the property] occurs, the use which would give rise to an easement must have been so long continued, obvious or manifest to that degree which will show the use was meant to be permanent." *Carter v. Michel*, 403 Ill. 610, 617 (1949).

Because no evidence was presented that the Baxters used the 50-foot strip as a means of going from Rotary Road to the land they owned by the Kishwaukee River before selling the property to the Wellivers, the trial court could *not* have found an easement implied from a preexisting use. Further, in announcing its decision, the trial court emphasized that in 1964, when the three parcels were originally bought by the Welliver family, it was "almost impossible" to construct a road through the gully on the Welliver's 50-foot access strip. Thus, it would appear that the trial court granted the plaintiffs an easement implied by necessity.

However, we determine that the trial court's decision to grant the plaintiffs an implied easement by necessity over that portion of their access road which traverses the defendant's property must be reversed. This court has previously discussed such an easement and held, "proof of prior use is not required when the land *presently* could not be used, absent the easement, or could not be used without disproportionate effort and expense." (Emphasis added.) *Deem v. Cheeseman*, 113 Ill. App. 3d 876, 883 (1983). In *Deem*, this court also held, "[w]here available alternatives exist that afford reasonable means of ingress and egress, easements by implication should not be sanctioned." *Deem*, 113 Ill. App. 3d at 883; see also *People ex rel. Helgeson v. Hackler*, 21 Ill. 2d 267, 270 (1961). Our review of the record in this case indicates that, while the plaintiffs presented some evidence regarding the necessity of the access road in 1964, no evidence was presented regarding: the *present* need for the easement; whether other alternatives *presently* exist; and whether it would be *presently* possible to construct a road or bridge across the obstructive gully,

and, if so, the cost of such construction. Thus, the trial court had no basis to determine whether the Wellivers could presently use their land without the easement or presently use their land without a disproportionate effort and expense unless the easement were granted. See *Deem*, 113 Ill. App. 3d at 883. Consequently, we reverse the trial court's grant of the easement in question.

The judgment of the circuit court of Winnebago County is reversed.

Reversed.

THOMAS and HUTCHINSON, JJ., concur.