NO. 4-01-0989 

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

JOSEPH S. DOTSON, a Minor by His Next Friend and Father, L. STANTON DOTSON,

Plaintiff-Appellee,

v.

FORMER SHAREHOLDERS OF ABRAHAM LINCOLN LAND AND CATTLE COMPANY, INC., an Illinois Corporation Designated Under No. D5075-865-6H in the Illinois Secretary of State's Office, Which Was Incorporated From October 11, 1975, to March 1, 1985, as an Illinois Corporation, and UNKNOWN OWNERS,

Defendants-Appellants.

)

)

)

)

)

)

)

)

)

)

)

)

)

Appeal from

Circuit Court of 

Coles County

No. 98CH6

Honorable

Robert B. Cochonour,

Judge Presiding.

JUSTICE KNECHT delivered the opinion of the court:

In March 1998, plaintiff, Joseph S. Dotson (Joseph or plaintiff), a minor by his next friend and father, L. Stanton Dotson (Dotson), an attorney, filed suit to quiet title in a parcel of real estate situated in Coles County that once belonged to Abraham Lincoln and that was later owned by defendant corporation, Abraham Lincoln Land and Cattle Company, Inc., and unknown owners (collectively, defendants).  As the grantee of a nominal share of the parcel, whose prior owner, Dotson, had paid the real estate taxes for seven years, plaintiff claimed title should be quieted in his favor pursuant to section 13-110 of the Code of Civil Procedure, also referred to as the Limitations Act (735 ILCS 5/13-110 (West 1996)).  In March 2001, the trial court found that plaintiff had established all elements of section 13-110 and quieted title to the parcel in plaintiff.  Defendants appeal.  We reverse.

I. BACKGROUND

In 1841, the 40-acre farm parcel was purchased by Abraham Lincoln from his father, Thomas Lincoln, who reserved a life estate in the property for himself and his wife, Sarah Bush Lincoln.  Abraham Lincoln was a frequent visitor to the parcel, and it was the only farm property he ever owned.

Sarah Bush Lincoln resided on the farm until her death in 1869, some four years after the assassination of Abraham Lincoln.  Prior to 1900, the parcel was obtained by the ancestors of Raymond Phipps, who received 36 acres of the parcel from his grandparents' estate in 1973.

In 1975, Phipps developed a business plan to sell interests in a portion of the parcel, based upon its connection to Abraham Lincoln.  Pursuant to this plan, Phipps platted and recorded a four-acre portion of the entire 40-acre parcel as the Abraham Lincoln Memorial Farm Plat (Farm Plat).  The Farm Plat consisted of four separate lots of approximately one acre, numbered 1 through 4 (Lots 1 through 4).  These lots were rectangular in shape, approximately 132 feet by 330 feet, running along a north-south axis, with the short ends of the rectangles forming the boundaries between the lots.  The entire four-acre tract formed a large, 132-foot-wide, 1,320-foot-long rectangle.  Eventually, Phipps transferred his entire interest in the Farm Plat to a for-profit Illinois corporation he had recently formed, Abraham Lincoln Land & Cattle Company, Inc. (Lincoln Land I).

As described by Phipps, the corporate aim of Lincoln Land I was to sell nominal deeds, primarily for souvenir purposes, to Lot 1 of the Farm Plat to persons interested in the history of Abraham Lincoln and Coles County.  Under this plan, each deed would transfer a 1/1,672,640 undivided interest--approximately one square inch--in Lot 1 of the Farm Plat.  According to Phipps, the proximity of the Farm Plat near the Abraham Lincoln State Park and other sites of local and historic interest would be a salient feature in the sale of the souvenir deeds.  Phipps eventually developed a strategy to market the deeds, planning to use the proceeds to maintain the land and to make a small profit.  Phipps was even successful in persuading the Neiman-Marcus department store to offer the deeds in its famous Christmas catalog in 1977.

On June 3, 1976, plaintiff's father and next friend, Dotson, purchased one of the souvenir deeds.  At that time, Dotson considered the deed a "memento" of Abraham Lincoln, and he did not consider it as an investment or substantive interest in Lot 1.  Later, on August 30, 1976, Dotson recorded the deed with in the Coles County recorder's office.

Eventually, in the mid-1980s, Lincoln Land I became insolvent.  Phipps failed to pay franchise taxes, failed to file an annual report, and began paying Lincoln Land I's bills with his own funds.  On March 1, 1985, the Secretary of State dissolved Lincoln Land I without objection from Phipps.

In 1989, Dotson learned Lincoln Land I had been dissolved.  After contacting the Secretary of State and learning the corporate name Abraham Lincoln Land & Cattle Company, Inc., was available, Dotson formed a not-for-profit corporation with the same name (Lincoln Land II).

On July 24, 1989, Dotson prepared and executed a deed of his interest in Lot 1 in favor of his then-wife, Judith Anna Dotson (Judith).  However, the legal description omitted the fractional interest, so the deed purported to transfer an entire interest in Lot 1 to Judith.  Further, the deed indicated all future real estate tax bills should be mailed to Judith.  Dotson paid the $1 transfer tax.

As part of dissolution proceedings, on March 28, 1991, Judith transferred several parcels of real estate, via warranty deed, back to Dotson.  Among these was the interest in Lot 1 created by the July 24, 1989, deed from Dotson to Judith.  This deed specified all future tax bills should be sent to Dotson.

Two months later, on June 10, 1991, Dotson quitclaimed the interest in Lot 1 to his second wife, Laurie Ann Roley Dotson (Laurie), and he specified all future tax bills should be sent to her.  Then, on June 2, 1992, Dotson and Laurie, listed as cograntors, purportedly transferred the interest in Lot 1 to plaintiff via warranty deed.  This deed specified all future tax bills should be sent to plaintiff.

On December 2, 1997, Laurie quitclaimed an interest in Lot 1, "except the [n]orth [e]ight (8) [f]eet thereof," to plaintiff and stated all future tax bills should be sent to plaintiff.  Dotson was not listed as a cograntor on this deed.  According to defendants, at some point after this deed, Dotson purportedly quitclaimed the north eight feet of Lot 1 to an individual who was running for Congress.

Then, on January 29, 1998, Laurie executed a "corporation warranty deed" as president of, and on behalf of, Lincoln Land II.  This deed purported to transfer Lot 1, except "[t]he [n]orth 8 feet of Lot One (1), except the [n]orth 1 foot thereof and except the east 12 feet thereof," to plaintiff.  Dotson attested this deed as the secretary of Lincoln Land II.

By this point, Dotson had received and paid the real estate taxes due on Lot 1 for the tax years 1990 through 1996, each payable in the following year.  In those years, the tax due on Lot 1 never exceeded $40.  Through those same tax years, Phipps received and paid the tax bills for Lots 2, 3, and 4.  According to Phipps, he did not notice when the Coles County assessor stopped sending the tax bills for Lot 1 because he received a single bill which did not itemize what amounts were due on which lots or which lots it covered.  Instead, the bill simply specified an amount due, which varied from year to year.  For example, Phipps's tax bill--with no specification as to the lots covered--amounted to $267.26 in 1992, $308.20 in 1993, $355.84 in 1994, and $305.86 in 1995.

On February 19, 1998, Dotson strung a single, loose strand of barbed wire across the south boundary of Lot 1, which is adjacent to a road.  Additionally, Dotson posted a no-trespassing sign on the fence.  The eastern, western, and northern boundaries were not then otherwise fenced.

On March 4, 1998, plaintiff and Dotson filed a petition to quiet title, naming the former shareholders of Lincoln Land I and unknown owners as defendants.  Service was made by publication, and in the affidavit required for such service, Dotson attested to his inability to locate the unknown owners after a diligent inquiry.  According to defendants, however, the original deed of the nominal interest included Phipps's name and address, which was still his address on March 4, 1998.

After a three-day trial in January 2001, the trial court issued a four-page memorandum opinion (memorandum opinion) on March 13, 2001, granting quiet title to plaintiff.  While the memorandum opinion stated "judgment is entered for the [p]laintiff and quiet title is granted [plaintiff]," no mention was made of whether the trial court would require the parties to submit a written draft order.

The following day, March 14, 2001, plaintiff and Dotson filed a motion for sanctions pursuant to Supreme Court Rule 137 (155 Ill. 2d R. 137).  On March 22, 2001, defendants filed a notice of appeal to this court, seeking reversal of the trial court's judgment as expressed in the memorandum opinion, docketed No. 4-01-0250.  After a hearing on the motion for sanctions on April 19, 2001, the trial court denied the motion the same day in a docket entry, which stated, "[b]y [a]greement of [c]ounsel, the docket entry will stand as dispositive."

On July 3, 2001, defendants filed a motion in this court seeking voluntary dismissal of their own appeal, arguing the notice of appeal was premature under Supreme Court Rule 272 (137 Ill. 2d R. 272) and a local rule of the Fifth Judicial Circuit (5th Judicial Cir. Ct. R. XI(A) (eff. November 3, 1997) (III Ill. Court Rs. & Proc. 193 (West 2002))).  We granted the motion on July 5, 2001.  
Dotson v. Former Shareholders of Abraham Lincoln Land & Cattle Co.
, No. 4-01-0250 (July 5, 2001) (dismissal order).

After the dismissal of defendants' appeal, defendants' counsel wrote to plaintiff's counsel July 13, 2001, requesting plaintiff submit a written judgment order for the trial court's signature.  When plaintiff failed to respond, defendants filed a motion for entry of judgment in the trial court on September 5, 2001.  The trial court denied this motion on October 11, 2001, stating in a docket entry: "Motion denied.  Docket entry to stand as and for the [c]ourt's order."  On November 9, 2001, defendants filed this second notice of appeal with this court, docketed No. 4-01-0989.

II.  ANALYSIS

On appeal, defendants argue the trial court erred by (1) finding plaintiff had established "good faith" under section 13-110 of the Limitations Act and (2) finding plaintiff had established possession of Lot 1.  Plaintiff has objected to this court's jurisdiction to entertain defendants' appeal, claiming defendants' notice of appeal was untimely.

A.  Finality of the Memorandum Order For Purposes of Appeal

Plaintiff contends this court is without jurisdiction based on the trial court's March 13, 2001, memorandum opinion.  Plaintiff asserts the memorandum opinion constituted the trial court's final judgment for purposes of appeal.  Defendants contend the March 2001 memorandum opinion was not a final order pursuant to Supreme Court Rule 272 (137 Ill. 2d R. 272) and Local Rule XI(A) of the Fifth Judicial Circuit (Fifth Judicial Cir. Ct. R. XI(A) (eff. November 3, 1997) (III Ill. Court Rs. & Proc. 193 (West 2002))).  We agree with defendants.

Supreme Court Rule 303(a) requires a party seeking an appeal to file a notice of appeal "within 30 days after the entry of the final judgment appealed" or "within 30 days after the entry of the order disposing of the last pending post[]judgment motion."  155 Ill. 2d R. 303(a).  Plaintiff contends this period began running when the trial court filed its memorandum opinion on March 13, 2001, and defendants' appeal should have been filed within 30 days thereafter.

We are unpersuaded by this characterization.  First, when a memorandum opinion contemplates the entry of a formal written order, it is not a final order for purposes of appeal.  
Stoermer v. Edgar
, 119 Ill. App. 3d 514, 515, 456 N.E.2d 701, 702 (1983).  A "memorandum signed by the court cannot be deemed to be the judgment of record; it is but a direction to enter judgment or an indication of what the [court's] judgment will be."  
Stoermer
, 119 Ill. App. 3d at 515, 456 N.E.2d at 702. 

Here, the trial court's memorandum opinion, while stating "judgment is entered for the [p]laintiff," failed to state whether a formal order would follow or whether it was necessary.  This ambiguity leads us to the reason we are not persuaded to accord the memorandum opinion the finality plaintiff urges.   Supreme Court Rule 272 states as follows:

"If at the time of announcing final judgment the judge requires the submission of a form of written judgment to be signed by the judge or 
if
 
a
 
circuit
 
court
 
rule
 
requires
 
the
 
prevailing
 
party
 
to
 
submit
 
a
 
draft
 
order
, the clerk shall make a notation to that effect and the judgment becomes final only when the signed judgment is filed."  (Emphasis added.)  137 Ill. 2d R. 272.

Plaintiff contends the memorandum opinion constituted the trial court's final judgment, because the memorandum opinion did not require either party to submit a written order.

However, the sort of local rule contemplated by Supreme Court Rule 272, requiring the submission of a written order to ensure finality of judgment, was in effect in the proceedings before the trial court.  Local Rule XI(A) of the Fifth Judicial Circuit, titled "Written Draft Orders," provides as follows: "When the court *** enters a final judgment, the attorney for the prevailing party 
shall
 submit [a written draft order] to the court within 30 days [sic], unless otherwise directed by the court."  (Emphasis added.)  5th Judicial Cir. Ct. R. XI(A) (eff. November 3, 1997).  Under the local rule, a party seeking a final judgment must supply the court with a written draft order unless the court indicates otherwise.

Here, the trial court's memorandum opinion was silent on whether a written draft order was required.  The mandatory language of the local rule thus required plaintiff to submit a written order for the trial court's signature.  However, our review of the record indicates no written draft order followed the court's memorandum opinion.  Thus, our reluctance to characterize the memorandum opinion as a final judgment is based on plaintiff's failure to comply with the relevant supreme court rule and local rule.  Had plaintiff believed the memorandum opinion constituted the trial court's final judgment, the burden of formalizing it fell to him.  He failed to carry this burden.

Finally, even if the memorandum opinion constituted a final judgment, plaintiff negated its finality the following day by filing a motion for sanctions pursuant to Supreme Court Rule 137 (155 Ill. 2d R. 137).  As our supreme court has consistently held, no appeal may be taken from an otherwise final judgment entered on a claim when a sanctions claim remains to be resolved, absent a finding pursuant to Rule 304(a) (155 Ill. 2d R. 304(a)) of no just reason to delay enforcement or appeal.  
John G. Phillips & Associates v. Brown
, 197 Ill. 2d 337, 340, 757 N.E.2d 875, 877 (2001), quoting 
Marsh v. Evangelical Covenant Church
, 138 Ill. 2d 458, 468, 563 N.E.2d 459, 464-65 (1990).  This stems from our supreme court's interpretation of its own rules regarding motions for sanctions.  According to our supreme court, motions for sanctions under Rule 137 are "claims" in the cause of action with which they are connected.  
Brown
, 
197 Ill. 2d at 339, 757 N.E.2d at 877. "In this regard, filing a Rule 137 motion is the functional equivalent of adding an additional count to a complaint, or counter[]claim, depending on which party files the motion."  
Brown
, 197 Ill. 2d at 340, 757 N.E.2d at 877.

Any notice of appeal filed prior to the trial court's resolution of plaintiff's sanctions motion would have been premature without a Rule 304(a) finding.  On April 19, 2001, the trial court ruled on plaintiff's motion for sanctions in a docket entry and denied plaintiff's requests for sanctions and stated, "[b]y [a]greement of [c]ounsel, the docket entry will stand as dispositive."  No mention, or incorporation, of the March 2001 memorandum opinion was made.

We cannot say this order constituted a final judgment resolving all claims.  As our supreme court has held, "[i]f an order does not resolve 
every
 right, liability[,] or matter raised, it must contain an express finding that there is no just reason for delaying an appeal.  Otherwise, the order is not appealable."  
Marsh
, 138 Ill. 2d at 465, 563 N.E.2d at 463; see also 155 Ill. 2d R. 304(a) ("an appeal may be taken from a final judgment as to one or more but fewer than all of the parties or claims only if the trial court has made an express written finding that there is no just reason for delaying either enforcement or appeal or both").

Defendants' September 5, 2001, motion for entry of judgment, while not a proper motion for a Rule 304(a) finding, was simply defendants' attempt to require plaintiff, or the trial court, to comply with the local rule and Supreme Court Rule 272.  Only when the trial court denied that motion was it clear to all parties the court had conclusively entered final judgment on all issues.  We find defendants timely filed their notice of appeal herein, and our jurisdiction is proper.

B.  The Trial Court Erred in Entering Judgment for Plaintiff

Defendants advance two arguments on appeal:  (1) the trial court erred in concluding plaintiff established the good faith required by section 13-110 of the Limitations Act, and (2) the trial court erred in concluding plaintiff established sufficient possession of the Lot 1.  As to both issues, we agree with defendants and reverse.

1.  
Elements
 
for
 
Acquiring
 
Title
 
to
 
Vacant
 
Land

Section 13-110 of the Limitations Act provides, in pertinent part as follows:

"Whenever a person having color of title, made in good faith, to vacant and unoccupied land, pays all taxes legally assessed thereon for 7 successive years, he or she shall be deemed and adjudged to be the legal owner of such vacant and unoccupied land, to the extent and according to the purport of his or her paper title."  735 ILCS 5/13-110 (West 1996).

To establish title under this section, a claimant must establish (1) color of title to the parcel, (2) his or her good faith in acquiring title, (3) the vacancy of the land, and (4) payment of the real estate taxes on the parcel for seven consecutive years.  We note, however, a long-standing judicial construction, requiring a person seeking to perfect title under section 13-110 also take possession of the property.  See 
Jones v. Unknown Heirs or Legatees of Fox
, 313 Ill. App. 3d 249, 255-56, 728 N.E.2d 1157, 1163 (2000);
 
Slatin's Properties, Inc. v. Hassler
, 53 Ill. 2d 325, 328, 291 N.E.2d 641, 642-43 (1972).

2.  
Standard
 
of
 
Review
 
of
 
Section
 
13-110
 
Claims

The parties disagree regarding the standard of review.  Plaintiff maintains, with little support, the abuse of discretion standard should apply.  Defendants argue in favor of a mixed standard of review.  According to defendants, while the issues of a section 13-110 claimant's good faith (see 
Hardin v. Gouveneur
, 69 Ill. 140, 143 (1873)) and possession (
Klingel v. Kehrer
, 81 Ill. App. 3d 431, 438, 401 N.E.2d 560, 566 (1980)) are issues of fact, the ultimate question before the trial court was a mixed question of law and fact.  Such questions involve "an examination of the legal effect of a given set of facts" and are reviewed under the clearly erroneous standard.  
AFM Messenger Service, Inc. v. Department of Employment Security
, 198 Ill. 2d 380, 391, 763 N.E.2d 272, 279 (2001).  

We failed to locate any case affirmatively stating the standard of review in cases brought pursuant to section 13-110 of the Limitations Act.  In addition to the cases cited by plaintiff, we find persuasive the similarity between adverse possession cases (see 
735 ILCS 5/13-101 (West 1996))
 and those brought under section 13-110
.  In adverse possession cases, all presumptions are made in favor of the record titleholder, and overcoming the presumption requires strict proof of the element, which may not be made out by inference or implication.  
Mann v. La Salle National Bank
, 205 Ill. App. 3d 304, 309, 562 N.E.2d 1033, 1037 (1990).  The burden of proof upon an adverse possessor requires each element be proved by clear and unequivocal evidence.  
Joiner v. Janssen
, 85 Ill. 2d 74, 81, 421 N.E.2d 170, 174 (1981)
.  Since our supreme court has not explained "clear and unequivocal proof," courts have applied the clear and convincing burden of proof in adverse possession cases.  
Estate of Welliver v. Alberts
, 278 Ill. App. 3d 1028, 1036, 663 N.E.2d 1094, 1098 (1996).

We conclude this is the appropriate standard in claims brought under section 13-110 of the Limitations Act as well.  Many early cases addressing predecessor sections to section 13-110 indicate all 
presumptions should be made in favor of the holder of legal title, and, as against him, no presumptions should be made in favor of the holder of mere color of title.  See 
Towle v. Quante
, 246 Ill. 568, 574, 92 N.E. 967, 969 (1910)
; see also 
Slatin's Properties, Inc. v. Hassler
, 132 Ill. App. 2d 882, 886-87, 271 N.E.2d 665, 668 (1971), 
rev'd
 
on
 
other
 
grounds
, 53 Ill. 2d 325, 291 N.E.2d 641 (1972).

Insofar as a claimant under section 13-110 is entitled to no presumptions as the holder of color of title only, it follows that every element of possession under section 13-110 must be clearly proved.  Thus, our review is simplified as the following question:  was the trial court's conclusion plaintiff clearly proved every element of section 13-110 clearly erroneous?

2.  
The
 
Trial
 
Court
 
Erred
 
in
 
Finding
 
Plaintiff's
 
Good
 
Faith

Defendants first argue the trial court erred in finding plaintiff had established good faith under section 13-110.  The words "good faith" must receive a practical, commonsense construction; thus, a purchaser who buys and pays his money for land under the belief he is acquiring title, acquires title in good faith.  
Winters v. Haines
, 84 Ill. 585, 588 (1877); see also 
Bergesen v. Clauss
, 15 Ill. 2d 337, 343, 155 N.E.2d 20, 23 (1958) (good faith "depends upon the purpose with which the deed is obtained, and the reliance placed upon the claim and the color.  A party receiving color of title, knowing it to be worthless, or in fraud of the owner's rights, although he holds the color and asserts the claim, can not render it availing, because of the want of good faith").  Simply put, the good faith required by section 13-110 can be defined negatively as the absence of an intent to defraud the holder of better title or as the absence of bad faith.  
McCree v. Jones
, 103 Ill. App. 3d 66, 70, 430 N.E.2d 676, 678 (1981), citing 
Gochenour v. Logsdon
, 375 Ill. 139, 142, 30 N.E.2d 666, 668 
(1940).  This requirement distinguishes a claimant under section 13-110 from an adverse possession claimant under section 13-101.  See 
Joiner
, 85 Ill. 2d at 81-84, 421 N.E.2d at 174-75 (comparing previous versions of sections 13-110 and 13-101).

In its memorandum opinion, the trial court addressed the good faith of plaintiff by stating the original June 3, 1976, deed conveying the nominal interest in Lot 1 "was made in good faith and is the foundation for all subsequent deeds of record which the [c]ourt finds not to have been made in bad faith."  However, in the very same factual finding, the trial court acknowledged the following: "while the subsequent deeds could not enlarge the ownership interest [in Lot 1,] they did convey the undivided interest in the whole of the subject property."

A deed that purports by its description to convey more land than actually belongs to the grantor is sufficient to establish color of title to all of the land included in the description (
Clayton v. Feig
, 179 Ill. 534, 539, 54 N.E. 149, 151 (1899)), but we cannot agree the later deeds were similarly made in good faith.  It is critical to note the real parties in interest.  While the named plaintiff is Dotson's son, a minor, the party responsible for (1) the payment of the real estate taxes and (2) any acts of possession was Dotson, who was aware the initial interest conveyed was not the same purportedly conveyed by the later deeds.  In fact, Dotson himself had drafted those deeds.  Most notably, Dotson testified he told Judith "I will sell it to you, the whole acre, because they probably won't pay taxes on it, and, if they don't and you pay taxes and you go through the proper procedures, you will own it in seven or eight years."

If the good faith required by the statute is to be given a commonsense construction, the trial court's finding regarding the plaintiff's good faith cannot stand.  We conclude section 13-110's good-faith requirement is meant to protect innocent transferees from loss of their investment by the misrepresentations of the transferor (see 
Bergesen
, 15 Ill. 2d at 343, 155 N.E.2d at 23), rather than to provide a shortcut around the 20-year possession period required of an adverse possessor.  None of the transfers of interest in Lot 1 was an arm's-length transaction.  As he admitted at oral argument, Dotson shifted the ownership to members of his own family, aware his individual "reliance on the claim and color" would not be sufficient to establish his good faith under section 13-110.  See 
Bergesen
, 15 Ill. 2d at 343, 155 N.E.2d at 23.  We conclude plaintiff failed as a matter of law to prove good faith by clear and convincing evidence.

3.  
The
 
Trial
 
Court
 
Erred
 
in
 
Finding
 
Plaintiff

Established
 
Possession

Defendants next contend the trial court erred in concluding plaintiff had established sufficient possession of Lot 1.  As noted, a long-standing judicial construction requires a claimant under section 13-110 to take possession of the property at the conclusion of the seven-year period.  See 
Jones
, 313 Ill. App. 3d at 256, 728 N.E.2d at 1163.  Under this construction, the possession must (1) be of such a nature as to place others claiming title upon inquiry, and (2) apprise the community or neighborhood the parcel is in the exclusive use and enjoyment of the person or persons so appropriating it.  
Jones
, 313 Ill. App. 3d at 256, 728 N.E.2d at 1163.  Further,
 a section 13-110 claimant's possession "cannot be inferred but must be clearly proven."  
Slatin's Properties
, 132 Ill. App. 2d at 886-87, 271 N.E.2d at 668.

In its memorandum opinion, the trial court found "[i]n February 1998, Dotson took possession of the property by erecting a fence thereon and putting a no-trespassing notice at the entrance."  Further, the trial court found plaintiff "has taken occupancy of the subject property by means of fencing, posting, and maintaining his right and interest therein as evidenced by these proceedings."  We are not persuaded plaintiff clearly proved his possession.  

First, plaintiff failed to establish the community's perception of the ownership of Lot 1 in him by clear and convincing evidence.  Defendants presented the testimony of two witnesses, and the affidavit of another witness, who stated they were not aware of plaintiff's or Dotson's claim to Lot 1.  All three individuals believed Lot 1 to be in Phipps's possession.  Plaintiff contends some witnesses were aware of the fencing, but he points to no part of the record to indicate a witness's belief plaintiff or Dotson was in possession of the property.

Second, plaintiff failed to establish his possession of Lot 1 apprised the community or neighborhood the parcel was in plaintiff's exclusive use and enjoyment.  Plaintiff maintains the single-strand fence strung across the south side of Lot 1 in February 1998, along with the placement of the no-trespassing sign, sufficed to establish possession in plaintiff.  We are not persuaded.  To further borrow from the adverse possession context, when a party seeks to establish possession of a discrete parcel of real estate, the boundaries of the property to which the party claims title must be susceptible of specific and definite location.  
Tapley v. Peterson
, 141 Ill. App. 3d 401, 404-05, 489 N.E.2d 1170, 1172 (1986).  The critical aspect of possession is to provide notice to the community.  See 
Jones
, 313 Ill. App. 3d at 256, 728 N.E.2d at 1163.

Here, plaintiff initially fenced only the southern boundary of Lot 1.  This single act was insufficient to put the entire community on notice of plaintiff's possession of the entirety of Lot 1.  We are persuaded most in this regard by the geographic orientation.  Immediately to the north of Lot 1 sits Lot 2, a parcel in which plaintiff never claimed any interest and upon which sits a log cabin structure.  In fact, the community's belief of Phipps's possession of the entire Farm Plat was based upon his frequenting the cabin.  For example, defendant presented the testimony of Randy Jackson, the assistant manager of the immediately adjacent Abraham Lincoln State Park.  Jackson testified he often visited Phipps at the log cabin, both before and after February 1998, and his belief as to Phipps's possession of the entire tract was based on these experiences.  Moreover, Jackson testified he never saw Dotson at Lot 1.  Other witnesses for defendant testified in a similar manner.

Absent any action clearly separating plaintiff's possession of Lot 1 from any possession of Lot 2, plaintiff's fencing of the southern border of Lot 1 did not constitute sufficient notice of possession.  A casual passerby would not have been put on notice that an entire one-acre lot stood between the log cabin and the southern boundary of the Farm Plat.  Similarly, the no-trespassing sign was as attributable to Phipps as to plaintiff, insofar as no boundary was established between the two parcels.

Plaintiff presented no evidence of possession other than the fencing.  No witnesses testified on behalf of plaintiff regarding plaintiff's presence on Lot 1, and defendants presented the testimony of at least three witnesses who stated they had never seen plaintiff or Dotson on Lot 1.  This does not strike us as the sort of visible possession required of a section 13-110 claimant.  See 
Jones
, 313 Ill. App. 3d at 256, 728 N.E.2d at 1164 (holding an "apparent lack of activity and [an] infrequency of visitors are not consistent with possessing the property in a manner which places others on inquiry and apprises the neighborhood of plaintiffs' exclusive use").

III.  CONCLUSION

For the reasons stated, we reverse the trial court's judgment and remand with directions to enter judgment for defendants.

Reversed and remanded with directions.

MYERSCOUGH, J., concurs.

McCULLOUGH, P.J., dissents.

PRESIDING JUSTICE McCULLOUGH, dissenting:

I agree with the majority that the trial court erred in finding plaintiff's good faith and erred in finding plaintiff established possession.

With reluctance I dissent and would find the appeal untimely.

The trial court on March 13, 2001, issued the four-page memorandum opinion and, as stated by the majority, the opinion stated:

"Based on the foregoing recitation, judgment is entered for the Plaintiff and quiet title is granted Joseph S. Dotson in the described property.

This Judgment entered at Charleston, Illinois, this 13th day of March, 2001."

The record also shows the motion for sanctions filed March 14, 2001, defendant's memorandum in opposition to the motion, and plaintiff's response to defendant's memorandum.  On April 19, 2001, the trial court, after hearing, denied the motion showing "By Agreement of Counsel, the [this] docket will stand as dispositive."  The record shows no reference by either party at the April 19 hearing to suggest there was no judgment entered on March 13, 2001.

A notice of appeal was filed on March 22, 2001, asking that this court reverse the judgment entered on March 13, 2001.  On July 3, 2001, defendants filed a motion for voluntary dismissal, which was granted by the trial court on July 5, 2001. 

Defendants took no further action until September 5, 2001, when they filed the motion for entry of written judgment.

The judgment entered on March 13, 2001, did not violate Supreme Court Rule 272 (137 Ill. 2d R. 272), nor does the local circuit court rule require a different result.  As noted above, the notice of appeal recognized that the March 13, 2001, memorandum was a judgment.  In addition, the local rule required that the proposed judgment be submitted "within 30 days, unless otherwise directed by the court."  5th Judicial Cir. Ct. R. XI(A) (eff. November 3, 1997).  It is clear from a review of the transcript of the October 11, 2001, hearing, the statements of the trial court, and the actions of the parties that the March 13, 2001, memorandum opinion was a judgment "directed by the court." 

The appeal should be dismissed as untimely.