LAVERNE MALONE *et al.*, Plaintiffs-Appellees, v. KENNETH SMITH *et al.*, Defendants-Appellants.

Fourth District    No. 4—04—0156

---

Argued October 20, 2004.—Opinion filed February 16, 2005.

APPLETON, J., specially concurring in part and dissenting in part.

Rhonda L. Heinz (argued), of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellants.

Julie A. Beyers (argued), of Heavner, Scott & Beyers, of Decatur, and Michelle Schafer, of Ronald E. Osman & Associates, Ltd., of Marion, for appellees.

PRESIDING JUSTICE COOK delivered the opinion of the court:

This is the latest in a series of cases involving the ownership of a right-of-way of the Illinois Central Railroad (ICR), abandoned in the late 1980s. These cases have addressed section 912 of Title 43 of the United States Code (43 U.S.C. § 912 (1988)), which provides when lands of the United States are used by a railroad as a right-of-way and the right-of-way is abandoned, title shall vest in the persons to whom

title of the United States was granted, "purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad." An exception exists for "lands within a municipality, the title to which, upon forfeiture or abandonment, as herein provided, shall vest in such municipality." 43 U.S.C. § 912 (1988).

In *City of Maroa v. Illinois Central R.R.*, 229 Ill. App. 3d 503, 514, 592 N.E.2d 660, 667 (1992), we affirmed a declaratory judgment declaring that ICR had abandoned and forfeited its interest in the 200-foot right-of-way within the city limits of Maroa and that Maroa was the owner of that property. In *Marlow v. Malone*, 315 Ill. App. 3d 807, 812, 734 N.E.2d 195, 199-200 (2000), some owners of property adjacent to the abandoned right-of-way brought suit, claiming title under section 912. The defendants, plaintiffs in the present case, claimed title under a 1988 ICR deed to William C. Edwards. We rejected the claim of the adjacent landowners under section 912 because their deeds specifically excluded the land underlying the right-of-way. For example, one deed contained the language " '[t]hat part of the Southwest Quarter *** lying West of the [ICR] right-of-way.' " *Marlow*, 315 Ill. App. 3d at 817, 734 N.E.2d at 203. In *Smith v. Malone*, 317 Ill. App. 3d 974, 742 N.E.2d 785 (2000), other adjacent landowners, some of whom are defendants in the present case, brought an action against the Edwards grantees. We again rejected their claim because their land did not include the land underlying the right-of-way. We further concluded that "[w]e need not consider whether [the Edwards grantees] had title, nor do we need to decide who else might own the right-of-way." *Smith*, 317 Ill. App. 3d at 981, 742 N.E.2d at 790.

In the present case, the Edwards grantees, defendants in some of the previous cases, brought an action to quiet title. The Edwards grantees do not claim title based on their quitclaim deed from ICR. ICR did not have the power to convey the right-of-way. The United States' right-of-way grants contained an implied reversionary interest in the federal government in rights-of-way eventually abandoned by a railroad. *Marlow*, 315 Ill. App. 3d at 810, 734 N.E.2d at 198, citing *Northern Pacific Ry. Co. v. Townsend*, 190 U.S. 267, 271, 47 L. Ed. 1044, 1047, 23 S. Ct. 671, 672 (1903). Rather, the Edwards grantees seek to quiet title on the basis of adverse possession: their payment of taxes with color of title (735 ILCS 5/13—109 (West 2000)) or their payment of taxes on vacant land with color of title (735 ILCS 5/13—110 (West 2000)). The Edwards grantees also seek remedies for forcible entry and detainer, trespass, and injunctive relief.

The trial court found the following facts. When the ICR began to abandon portions of its right-of-way in the 1980s, William C. Edwards purchased a portion of the right-of-way as an investment. Edwards

received a quitclaim deed on February 1, 1988. The strip of land contains about 24½ acres including the roadbed. Edwards paid $357 per acre for the property. All of the right-of-way, except for the roadbed, is tillable but there are drainage problems in various locations because the roadbed interferes with runoff.

The Edwards grantees have paid the real estate taxes each year from the date of purchase to the present. Adjacent landowner Smith testified he attempted to pay the taxes but the county office refused to send him the bill. Ron Margenthaler had farmed the right-of-way for the railroad. In 1988, Margenthaler rented the land from the Edwards grantees and planted it in oats. In 1989 and 1990, the Edwards grantees placed crops on the property. The Edwards grantees leased the property to Darrell Miller, who planted crops in 1991 and 1992. In 1993, Miller discovered that someone else had planted crops on the land. Miller learned that a dispute had arisen between the Edwards grantees and adjacent landowner Smith and did not lease the property after 1993 because he did not desire to become involved in the dispute.

In 1993, the adjacent landowners began to farm the right-of-way so the Edwards grantees could no longer plant crops without destroying those already planted. In 1994, adjacent landowner Smith filed a lawsuit against the Edwards grantees, *i.e.*, the lawsuit referred to as *Smith*, 317 Ill. App. 3d 974, 742 N.E.2d 785. The Edwards grantees erected "no trespassing" signs at various times, but the signs were taken down by Smith. After *Smith* was decided in 2000, the Edwards grantees leased the property to Jim Trichl in 2001. Trichl planted a crop and harvested that crop. Trichl was not able to plant a crop on the acreage that abutted Smith's property in 2002 and 2003 because Smith's tenant placed a crop on the land in those two years. After *Smith* was decided, the other adjacent landowners ceased farming the land abutting their respective properties.

The trial court concluded that section 13—110 of the Code of Civil Procedure (735 ILCS 5/13—110 (West 2000)) did not apply because the land was not "vacant and unoccupied land." The section that applied was section 13—109:

> "Every person in the actual possession of lands or tenements, under claim and color of title, made in good·faith, and who for 7 successive years continues in such possession, and also, during such time, pays all taxes legally assessed on such lands or tenements, shall be held and adjudged to be the legal owner of such lands or tenements, to the extent and according to the purport of his or her paper title." 735 ILCS 5/13—109 (West 2000).

The court found the quitclaim deed to William C. Edwards from ICR was sufficient to establish the element of color of title. The court

found that the quitclaim deed was made in good faith because the Edwards grantees paid $357 per acre for the right-of-way, received a deed, paid taxes, and performed other acts consistent with ownership.

The court also found that the Edwards grantees were in actual possession of the property for seven successive years. The court recognized that "in 1993, some of the adjacent landowners began to intrude and plant crops on portions of the right-of-way that adjoined their land." However, "the actual possession that is necessary must be determined in view of the circumstances and conditions of the property." Although the adjacent landowners had entered the land to plant crops, it was common knowledge that ownership of the land was in dispute, and a lawsuit had been filed. "[T]aking into account the crops planted by plaintiffs and the defense of the lawsuit, the plaintiffs have shown possession for seven successive years beginning in 1988." The court later noted that this court had determined in *Smith* that the adjacent landowners did not obtain title pursuant to section 912 and the adjacent landowners had not suggested they claimed title pursuant to any other theory; "consequently, it is clear that none of the defendants have a claim to or are the legal owners of the disputed right-of-way."

First, we repeat that in *Smith*, 317 Ill. App. 3d at 981, 742 N.E.2d at 790, we concluded that "[w]e need not consider whether [the Edwards grantees] had title, nor do we need to decide who else might own the right-of-way." *Cf. McClellan v. King*, 133 Ill. App. 2d 914, 917, 273 N.E.2d 696, 698 (1971) ("[u]pon plaintiff['s] failure to reinstate his action we can only conclude that the hostile possession of the disputed tract was established").

■ Under section 13—109, the claimant must show actual and adverse possession of the lands for seven years, contemporaneously with his payment of taxes under color of title. *Beard v. Henn*, 28 Ill. 2d 11, 14, 190 N.E.2d 345, 347 (1963). The possession must be hostile or adverse, actual, visible, open and notorious, exclusive, and continuous. The burden of proof is demanding, and the evidence must be unequivocal. *Beard*, 28 Ill. 2d at 15, 190 N.E.2d at 347. To prevail under section 13—109, a litigant must prove (1) claim and color of title, made in good faith; (2) payment of taxes for seven successive years; and (3) continuous, uninterrupted, hostile possession for the statutory period adverse to the opponent. *Harlan v. Douthit*, 379 Ill. 15, 21, 39 N.E.2d 345, 348 (1942). "It is likewise settled that these three conditions must concur before the statute begins to run, and seven full years must have intervened between the day when the first payment of taxes was made and the day of the commencement of the litigation." *Harlan*, 379 Ill. at 21, 39 N.E.2d at 348.

"The party claiming exclusivity need not show that he possessed the property to the exclusion of all others." *Illinois District of American Turners, Inc. v. Rieger*, 329 Ill. App. 3d 1063, 1073, 770 N.E.2d 232, 241 (2002). The fact that third parties may at times make some use of the property does not destroy exclusivity. However, because exclusivity requires that the claimant possess the property independent of a like right in others, the opponent, the alleged rightful owner, must be altogether deprived of possession. *Illinois District*, 329 Ill. App. 3d at 1073, 770 N.E.2d at 241.

■ The adjacent landowners here were not altogether deprived of possession. The Edwards grantees' possession of the property was not continuous and uninterrupted. In 1993, the adjacent landowners began to farm the right-of-way and that use continued until 2001. Adjacent landowner Smith placed a crop on the land adjoining him in 2001 and 2003. The trial court apparently concluded that our decision in *Smith* had determined that the adjacent landowners had no right to the property and therefore their possession from 1993 to 2001 and beyond could be ignored. That is not correct. Our decision specifically refused to address whether the Edwards grantees or anyone else might own the right-of-way. *Smith*, 317 Ill. App. 3d at 981, 742 N.E.2d at 790. We also concluded that ICR did not have the power to convey the right-of-way. See *Marlow*, 315 Ill. App. 3d at 810, 734 N.E.2d at 198. The Edwards grantees and the adjacent landowners basically stand on an equal footing, each having no rights to the property other than they may have obtained by adverse possession. Under the exclusive-possession requirement, it is evident that two or more persons cannot hold one tract adversely to each other at the same time. *Estate of Welliver v. Alberts*, 278 Ill. App. 3d 1028, 1039, 663 N.E.2d 1094, 1100 (1996).

Accordingly, we reverse the decision of the trial court that the Edwards grantees have acquired title by adverse possession. We likewise reverse the award of money damages.

Reversed.

MYERSCOUGH, J., concurs.

JUSTICE APPLETON, specially concurring in part and dissenting in part:

I concur in the result and reasoning of the majority to the extent we find plaintiffs have failed to sustain their burden of proof as to their claim of title by adverse possession. I write separately because the parties to this endless litigation as well as the people of the State

of Illinois are entitled to a resolution of this matter on remand, which I believe requires additional parties. As defendants also raised as an issue on appeal the denial of their motion to add necessary parties, I dissent from the refusal of the majority to remand this cause for the purpose of doing so.

This court has previously held in *Smith*, 317 Ill. App. 3d at 981, 742 N.E.2d at 790, that the neighboring landowners had no right to the disputed right-of-way because the deeds conveying their interests granted title only to the boundary between their land and the right-of-way. We have also held in this case that the purchase of a quitclaim deed to the right-of-way by Malone's predecessors in title did not vest fee title in them. I suggest that having found that neither party owns the property at issue, this court should not simply ignore the question of who owns the right-of-way. In my opinion, this query is a subject for further proceedings on remand.

The history of this litigation and the genesis of the title problems created by the abandonment of the right-of-way by the Illinois Central Gulf Railroad (ICGR), successor of ICR, have been detailed in both the majority disposition here and in this court's prior opinion in *Smith*. The reasoning of those prior dispositions does not reach the ultimate question of ownership.

The United States, in the Thirty-first Congress, granted to the State of Illinois a right-of-way 200 feet in width from Cairo to La Salle with branches extending to Dubuque, Iowa, on the west and Chicago on the east, together with alternate sections of land (checkerboard), which were to be available for sale for the purpose of funding the construction of the railroad. 9 Stat. 466 (1850). The grant by the United States treated the right-of-way and the checkerboard separately, and I deal here only with the right-of-way.

Congress provided in section 1 of the September 20, 1850, act, "An Act granting the Right of Way, and making a Grant of Land to the States of Illinois, Mississippi, and Alabama, in Aid of the Construction of a Railroad from Chicago to Mobile," as follows:

> "That the right[-]of[-]way through the public lands be, and the same is hereby, granted to the State of Illinois for the construction of a railroad from the southern terminus of the Illinois and Michigan Canal to a point at or near the junction of the Ohio and Mississippi Rivers, with a branch of the same to Chicago, on Lake Michigan, and another via the town of Galena in said State, to Dubuque in the State of Iowa, with the right also to take necessary materials of earth, stones, timber, etc., for the construction thereof: *Provided*, That the right of way shall not exceed one hundred feet on each side of the length thereof, and a copy of the survey of said

road and branches, made under the direction of the legislature, shall be forwarded to the proper local land office respectively, and to the general land office at Washington city, within ninety days after the completion of the same." (Emphasis in original.) 9 Stat. 466 (1850).

The grant of the checkerboard was in fee, subject to a condition that the land be sold and the proceeds actually used for building the railroad. 9 Stat. 466 (1850). The grant of the right-of-way to the State of Illinois was not expressly so conditioned.

In response, the legislature of the State of Illinois adopted, as a private law, legislation that accepted the grant and gave the right-of-way absolutely and the checkerboard in trust to the ICR. "The said corporation shall have right of way upon, and may appropriate to its sole use and control, for the purposes contemplated herein, land, not exceeding two hundred feet in width through its entire length \*\*\*." 1851 Ill. Private Laws § 3, at 61. The conveyance of the checkerboard section was separately addressed by the Illinois act and provided for a conveyance to the railroad in fee simple.

"The said governor of the [S]tate of Illinois shall, in his official capacity, and in behalf of the [S]tate of Illinois, and under the great seal thereof, execute and deliver to the said company a deed, in fee simple, of all said lands granted by the government of the United States \*\*\*." 1851 Ill. Private Laws § 15, at 67.

The legislature further recognized that in the event the right-of-way passed over land to be sold under this scheme, the right-of-way would prevail:

"*And provided, further,* that the right[-]of[-]way upon and across any lot of land sold under the provisions of this section, not exceeding two hundred feet in width, shall be reserved and retained for the passage of the road, as the same may be located and constructed \*\*\*." (Emphasis in original.) 1851 Ill. Private Laws § 25, at 74.

It is beyond peradventure that all the railroad received from the State of Illinois by the grant of the right-of-way was an easement. *Illinois Central R.R. Co. v. Houghton*, 126 Ill. 233, 240, 18 N.E. 301, 303 (1888). Upon the abandonment of the line, as here, the right-of-way or easement expires as to the railroad. *Woodward Governor Co. v. City of Loves Park*, 335 Ill. App. 528, 534-35, 82 N.E.2d 387, 390 (1948); *Branch v. Central Trust Co. of Illinois*, 320 Ill. 432, 443, 151 N.E. 284, 288 (1926). No case answers the question of whether the grant of a right-of-way to a sovereign state contains the implied reverter upon a condition subsequent as does the state's grant of a right-of-way to the railroad, especially since the language of the grant contained no express reverter upon abandonment, only upon a failure to construct. This creates a question as to whether the State of Illinois may be a

necessary party to this litigation. See *Feen v. Ray*, 109 Ill. 2d 339, 344, 487 N.E.2d 619, 620 (1985) (rule of equity that any person who is interested in the subject matter of the litigation is a necessary and indispensable party); *Lakeview Trust & Savings Bank v. Estrada*, 134 Ill. App. 3d 792, 811, 480 N.E.2d 1312, 1326 (1985) (relevant inquiry is not whether the judgment in fact altered the absent person's interest in the subject matter but whether the absent person might claim a substantial interest).

In *Northern Pacific*, 190 U.S. at 267-68, 47 L. Ed. at 1044-45, 23 S. Ct. at 671, the Supreme Court related how Congress had granted Northern Pacific Railway Company a right-of-way over public lands in Minnesota. The method was similar to that in the present case, except the grant was directly to Northern Pacific Railway Company instead of to the state. Section 1 of the act of July 2, 1864, provided as follows:

> " 'And be it further enacted, That the right[-]of[-]way through the public lands be, and the same is hereby, granted to said Northern Pacific Railroad Company, its successors and assigns, for the construction of a railroad and telegraph, as proposed ***. Said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad ***.' " (Emphasis in original.) *Northern Pacific*, 190 U.S. at 268, 47 L. Ed. at 1045, 23 S. Ct. at 671, quoting 13 Stat. 367 (1864).

Section 3 of the act of July 2, 1864, "created a large land grant to secure the construction and continuous maintenance of the road." *Northern Pacific*, 190 U.S. at 268, 47 L. Ed. at 1045, 23 S. Ct. at 671.

Some homesteaders "cultivated up to the line of the ordinary and snow fences of the railroad, situated respectively fifty and one hundred feet from the center of the track, and such occupancy continued a sufficient length of time to constitute a title by adverse possession under the limitation statutes of Minnesota." *Northern Pacific*, 190 U.S. at 269, 47 L. Ed. at 1045, 23 S. Ct. at 672. Minerva Townsend later acquired title to the homesteaders' land. *Northern Pacific*, 190 U.S. at 269, 47 L. Ed. at 1045, 23 S. Ct. at 672. The railroad demanded she vacate its right-of-way, and when she refused, it brought an action for ejectment. *Northern Pacific*, 190 U.S. at 269, 47 L. Ed. at 1045, 23 S. Ct. at 672. The trial court found for the railroad, but the Supreme Court of Minnesota reversed the trial court's judgment on the ground of adverse possession. *Northern Pacific*, 190 U.S. at 269, 47 L. Ed. at 1045, 23 S. Ct. at 672.

The issue before the United States Supreme Court was as follows: "[W]hether, in view of the provisions of the act of Congress to which we have referred, an asserted title by adverse possession can be made efficacious as respects the property in controversy." *Northern Pacific*,

190 U.S. at 270, 47 L. Ed. at 1046, 23 S. Ct. at 672. The Court reasoned that "although there was a present grant [to the railroad], it was yet subject to conditions expressly stated in the act, and also \*\*\* to 'those necessarily implied, such as that the road shall be...used for the purposes designed.' " *Northern Pacific*, 190 U.S. at 271, 47 L. Ed. at 1047, 23 S. Ct. at 672, quoting *R.R. Co. v. Baldwin*, 103 U.S. 426, 429-30, 26 L. Ed. 578, 579 (1881). The Court stated:

> "Manifestly, the land forming the right[-]of[-]way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right[-]of[-]way or any portion thereof. \*\*\* In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted."

*Northern Pacific*, 190 U.S. at 271, 47 L. Ed. at 1047, 23 S. Ct. at 672.

The Court further reasoned that if Townsend could, by adverse possession, acquire title to the land underlying the right-of-way, she would be able to do indirectly what the railroad could not have done directly, *i.e.*, alienate the land to an individual for private use. *Northern Pacific*, 190 U.S. at 271, 47 L. Ed. at 1047, 23 S. Ct. at 672. Adverse possession was impossible because it would have "overthrow[n] the act of Congress": it would have been, ultimately, adverse possession against the United States government, which had an implied reversionary interest. *Northern Pacific*, 190 U.S. at 272, 47 L. Ed. at 1047, 23 S. Ct. at 673.

In response to the situation described in *Northern Pacific*, on March 8, 1922, Congress passed a statute providing as follows:

> "Whenever public lands of the United States have been or may be granted to any railroad company for use as a right[-]of[-]way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purpose has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by [a]ct of Congress, then and thereupon all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied

by such railroad or railroad structures ***." 43 U.S.C.S. § 912 (Law. Co-op. 1980).

At some point, many years after the construction of the railroad envisioned by the statutes quoted above, ICGR stopped using the right-of-way for railroad purposes. In 1986, the Interstate Commerce Commission (ICC) granted ICGR an exemption from prior approval requirements for the abandonment of certain railroad tracks, including the tracks on the land at issue in this case. ("An exemption from abandonment allows a railroad to discontinue rail service upon meeting certain statutory conditions ***, thereby avoiding the more rigorous ICC review otherwise required *** in a regular abandonment proceeding." *Gorsline v. State of Kansas, Department of Wildlife & Parks*, No. 91—4197—R (D. Kan. 1992) (nonpublished memorandum and order). No court of competent jurisdiction, however, has ever entered an order or decree of abandonment as to this or any other ICGR right-of-way insofar as this record discloses.

On October 4, 1988, Congress amended section 1248(c) of the National Trails System Act to provide as follows:

"(c) Abandoned railroad grants; retention of rights. Commencing upon the date of enactment of this subsection [enacted October 4, 1988], any and all right, title, interest, and estate of the United States in all rights-of-way of the type described in the Act of March 8, 1922 (43 U.S.C. § 912 (1980)), shall remain in the United States upon the abandonment or forfeiture of such rights-of-way, or portions thereof, except to the extent that any such right-of-way, or portion thereof, is embraced within a public highway no later than one year after a determination of abandonment or forfeiture, as provided under such Act." 16 U.S.C.S. § 1248(c) (Lexis 2000).

The viability of the analysis of the transfer of title to the right-of-way easements of abandoned rail lines under section 912 is now in question as Congress has apparently taken back what, if anything, it gave in section 912 as enacted in March 1922.

Under either section 912 or under the amended National Trails System Act, it is clear that the United States must be a party to this action. With regard to the question of whether the original grant contained a reverter as to the State of Illinois, it must be a party as well. With regard to whether an effective abandonment has occurred pursuant to federal law, ICGR should be a party. The trial court here denied the motion to add additional parties, and I find that denial to be in error.

For the foregoing reasons, I would remand this cause to the trial court for further proceedings involving all interested parties.