2024 IL App (2d) 230271-U
No. 2-23-0271
Order filed August 19, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| STOKOVICH FAMILY LIMITED PARTNERSHIP, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff and Counterdefendant-Appellant, | ) ) ) ) | |
| v. | ) ) | No. 22-CH-131 |
| LARISA KAUFMAN, as Trustee of the Larisa Kaufman Revocable Trust Dated July 16, 2007, | ) ) ) ) ) | |
| Defendant and Counterplaintiff-Appellee. | ) ) ) | Honorable Janelle K. Christensen, Judge, Presiding. |

_____

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Jorgensen and Mullen concurred in the judgment.

**ORDER**

¶ 1    *Held*: Plaintiff's improvements on a portion of defendant's adjacent property constituted possession that was both (1) hostile or adverse because, although defendant's property was undeveloped and vacant, the improvements were inconsistent with permissive use and incompatible with defendant's claim of right; and (2) open and notorious because the improvements were visible to the community from certain vantage points and suggested that the improved property belonged to plaintiff.

¶ 2    Plaintiff and counterdefendant, Stokovich Family Limited Partnership, filed a complaint

for trespass against defendant and counterplaintiff, Larisa Kaufman, as Trustee of the Larisa

Kaufman Revocable Trust Dated July 16, 2007. Plaintiff sought an injunction requiring defendant to remove certain improvements she made to plaintiff's property. Defendant filed an answer and an affirmative defense, claiming she came to own portions of plaintiff's property by adverse possession. Defendant also filed a counterclaim, seeking to quiet title to the portions of plaintiff's property that defendant allegedly now possessed. Following a bench trial, the trial court found in favor of defendant on the complaint and counterclaim. Plaintiff appeals, arguing that the court erred in finding that defendant's possession was (1) hostile or adverse and (2) open and notorious. We affirm.

¶ 3                                     I. BACKGROUND

¶ 4                            A. The Parties and Properties at Issue

¶ 5     Plaintiff (a partnership that included Milan Stokovich and Deborah Ann Stokovich as partners) owned two adjacent lots in Libertyville. Lot 1 was at 335 North Saint Mary's Road, and Lot 2 was at 315 North Saint Mary's Road (Lot 2). The property was transferred to plaintiff in 2002 by Stokovich Enterprises, LLC (Milan and Deborah's parents), which had previously owned the property for about 20 years. The property was vacant, unmaintained, and unenclosed at all relevant times.

¶ 6     In 1989, defendant and her now-deceased husband purchased property at 285 North Saint Mary's Road in Green Oaks, immediately south of Lot 2. Defendant has since lived there continuously. In 2007, defendant transferred the property to the Larisa Kaufman Revocable Trust Dated July 16, 2007, of which she is the trustee.

¶ 7                                    B. The Pleadings

¶ 8     On May 19, 2022, plaintiff filed a complaint for trespass, alleging that, while attempting to sell Lot 2, it learned that "a garden shed consisting of two sections and a portable wire fence

were encroaching" on the southern boundary of Lot 2. Plaintiff also alleged that defendant had been parking vehicles on Lot 2 and had erected barrier tape on Lot 2. Defendant refused plaintiff's request to remove the improvements and items. Plaintiff asked the court to order defendant to "remove the garden shed, temporary wire fence, personal property, refuse, vehicles[,] and barrier tape" from Lot 2.

¶ 9 On June 15, 2022, defendant filed an answer and affirmative defense. In her affirmative defense, defendant argued that she was the legal owner, through adverse possession, of two areas of Lot 2. According to defendant, when she purchased her property in 1989, a wire fence on the property extended onto Lot 2. Defendant described the "area enclosed by the wire fence" as the " 'Garden Shed Area.' " Defendant alleged that, in or around 1990, she erected a shed in the garden shed area. Defendant referred to the second area as the " 'Parking Area' " and described it as a "grassy area immediately north of [d]efendant's driveway." Defendant alleged that, since 1989, she has actually and continuously occupied and maintained both the garden shed area and the parking area. Defendant further alleged that her use of the two areas "has been open, notorious, hostile, and exclusive" and "under a claim of title inconsistent of [*sic*] the true owner(s)." Defendant also alleged that her use has been without permission of the true owners.

¶ 10 On June 15, 2022, defendant filed a counterclaim, asking the trial court to quiet plaintiff's title to the garden shed area and the parking area, based on defendant's claim that she was the legal owner of the two areas by adverse possession.

¶ 11                                     C. The Relevant Facts

¶ 12 A bench trial occurred on April 12 and April 14, 2023. Five witnesses testified in addition to defendant, Milan, and Deborah. They were: (1) Richard Pavletic, a surveyor hired by plaintiff; (2) Manuel Tellez, defendant's landscaper; (3) Ina Katz, defendant's longtime friend; (4) David

John Pinter, who owned the property at 265 North Saint Mary's Road, immediately south of defendant's property; and (5) Artur Grushevski, defendant's live-in boyfriend. Admitted exhibits included the relevant deeds, a Plat of Survey, numerous photographs, and fence pieces.

¶ 13 The photographs show that defendant's driveway runs west off North Saint Mary's Road. Defendant's mailbox is to the left of the driveway, which generally parallels the northern boundary line of defendant's property. As one enters the driveway, there are dense areas of trees and bushes on the right and left. The parking area is to the right of the driveway, just past the trees and bushes. The parking area is an open grassy clearing, described by Pavletic as a grassy "[a]lcove" mowed and bordered on three sides by "buckthorn[,] which are overgrown bushes." Defendant's garage is to the left of the driveway, across from the parking area. Defendant explained that she uses the parking area (1) to turn her car around, (2) as guest parking, and (3) for parking "extra" vehicles related to Grushevski's employment. The garden shed area is west of the parking area (also on the right) as one continues past the western edge of the buckthorn that formed the parking area alcove. (The driveway ends before reaching the garden shed area, but defendant's property extends past the end of the driveway.) A shed is located on the right, immediately west of the buckthorn. A structure for storing firewood (referred to as a "lean-to" by Pavletic) is located immediately north of the shed. Defendant testified that, when she bought the property, the garden shed area had a fence around the perimeter, which was still in place. Pavletic described the fence as a "portable, wire, garden type fence" that consisted of "green flimsy post[s] and square wire mesh." Pavletic testified that the fence begins north of the lean-to, runs west, and curves south to defendant's property. Pavletic prepared the following plat of survey for Lot 2, which was admitted during his testimony.

¶ 14



The two solid rectangles at the southern boundary of Lot 2 are the shed and lean-to. The plat also depicts the wire fence that starts immediately north of the lean-to and runs west before curving south.

¶ 15   There was some dispute over the age of the fence. Plaintiff took the position that the fence was relatively new. Defendant claimed that the fence was in its current position when she

purchased the property and that she left it unchanged except that Grushevski repaired a rusty section. Defendant submitted evidence in rebuttal that included (1) photographs of the existing posts, (2) a piece of a post, and (3) a piece of the chicken wire. In its finding of facts, the trial court observed:

> "The [d]efendant's photographs show that the posts have patches of rust as well as areas that are green and rust free. These photos show that the posts abut the overgrown 'jungle area.' The metal wire is rusted and almost impossible to see against the trees. The photos show that some of the posts have visible rust. *** The post [submitted into evidence] is green, and it has an area covered with rust. *** [T]he [chicken] wire [submitted into evidence] is rusty and rough to the fingertips."

The court also noted that Tellez testified that the fence has been on the property unchanged since he began working for defendant. Relying on Kaufman's and Tellez's testimony and the photographic and physical evidence, the court concluded that the fence was "aged, rather than new."

¶ 16 Defendant testified that, in 1991, her husband hired a contractor to build the shed and the lean-to. According to defendant, the shed had never been relocated. The driveway and the shed were connected by stepping stones, which defendant claimed she installed herself in 1991. The trial court specifically found that, although the photographs suggested that the shed had no permanent foundation, there was no evidence that the shed had been moved since 1991. The court also credited Pinter's testimony, which it described as "neutral and unbiased," that the shed had been on the property since 1991 or 1992.

¶ 17 The trial court received testimony and photographic evidence about the visibility of the shed. For instance, Pinter testified that he could see the shed from his backyard. He admitted

testifying at his deposition that he could not see the shed from North Saint Mary's Road. However, he testified that, after his deposition, he began actively trying to spot the shed from North Saint Mary's Road and could see "pieces of it" "when the leaves are off the trees." Milan was able to see the shed while standing on Lot 2.

¶ 18    The court made the following undisputed factual finding based on the evidence about the shed's visibility. The east side of the shed (facing North Saint Mary's Road) is "flanked by heavy buckthorn." Because buckthorn is a deciduous plant that loses its leaves in late fall and early winter, the shed is "slightly visible" from North Saint Mary's Road during late fall, winter, and early spring. To view the shed, one "must be trying to view the property line." A person driving on North Saint Mary's Road, with their eyes on the road, would likely not see the shed. However, "during late fall, winter, and early spring[,] the [s]hed and the disputed area are visible from the right of way in front of *** [d]efendant's property," where defendant's mailbox is situated.

¶ 19    Defendant testified that Tellez began landscaping for defendant at some point after 1999, when defendant's husband could no longer do so. According to Tellez, he has worked for defendant for about 21 years. As part of his weekly services, Tellez mowed the grass and trimmed the bushes and trees in the garden shed area and parking area.

¶ 20                          D. The Trial Court's Ruling

¶ 21    On July 19, 2023, the trial court entered its 24-page "Memorandum Opinion and Judgment Order," which included its findings of fact and law regarding each necessary element to acquire title under adverse possession. The court concluded that defendant had adversely possessed the "disputed property."

¶ 22    At issue in this appeal are the trial court's findings that defendant's possession of the property was (1) hostile or adverse and (2) open and notorious.

¶ 23    Concerning the element of "hostile or adverse" possession, the trial court acknowledged that permissive use is a defense to adverse possession and, further, that the use of a vacant lot may carry a rebuttable presumption of permissive use. However, the court found that plaintiff "cannot avail itself of this defense." The court distinguished the cases relied on by plaintiff, noting that in each case "the title holder entered evidence to support that presumption." The court continued:

> "Moreover, there is a difference between using vacant land for its intended purpose versus an assertion of ownership inconsistent with that right. Thus, where the farmer farmed the vacant farm field [(*Morris v. Humphrey*, 146 Ill. App. 3d 612 (1986))] or where the family used the vacant woods for entertainment [(*Estate of Welliver v. Alberts*, 278 Ill. App. 3d 1028 (1996))] or where the Shrakes drove on the road [(*Monroe v. Shrake*, 376 Ill. 253 (1941))], that type of use is presumed permissive. However, once the adverse possessor takes steps to visibly carve out a piece of the vacant land with defined boundaries and to use it for a purpose inconsistent with the use of the vacant land, the analysis shifts away from a presumption of permissive use. In the latter situation, the adverse possessor is affirmatively placing the neighborhood on notice that he or she is claiming the vacant property as his or her own. Thus here, where [defendant] placed a visible [f]ence, a [s]hed, a lean[-]to and a defined mowed area which is surrounded by a defined wall of 'jungle,' her action in so doing was hostile and adverse to the interests of the [p]laintiff. In so doing, she 'unfurled her figurative flag and kept waiving' it for 32 years. Hostile and adverse does not require ill will, rather, [it] is an assertion of ownership incompatible with any other claim of right. [Citation.] By carving out a defined piece of the vacant land and claiming it as her own, the [d]efendant's assertion of ownership was incompatible with the [p]laintiff's claim of right."

¶ 24    Regarding the "open and notorious" possession element, the trial court noted that the appropriate test was "whether the community is or could be apprised of the claimant's possession." The court noted that

> "[d]efendant submitted credible evidence that from her mailbox which is located on the public right of way, at certain time[s] of the year, the [s]hed and carve-outs[1] were visible. Thus, during this seasonal window, any person in the vicinity of the mailbox (mail and package delivery, anyone walking or biking along the right of way, anyone coming to [d]efendant's home) would be able to see the [s]hed and carve-outs."

¶ 25    The court further noted that, "during months when the leafy foliage drops, it is difficult, but possible, to see the [s]hed and carved our [*sic*] area while travelling on St. Mary's Road, if one is actively looking."  The court also noted Milan's testimony "that when he walked the southern edge of his property, he was able to see the [s]hed from his property."  The court noted that, while Milan "went years without walking the property, *** if [he] had walked that end of the property from 1991 to the present date, [he] would have been able to see the [s]hed."  The court further stated:

> "[A]ny neighbor viewing the disputed area would assume that the disputed area belonged to *** [d]efendant.  The disputed property sits adjacent to *** [d]efendant's driveway. The [s]hed has steps leading to the driveway.  The door to the [s]hed faces *** [d]efendant's driveway and house.  Part of the mowed area by the [s]hed is marked by a [f]ence.  The area by the carve out is nicely mowed with cultivated and manicured green

---

[1]The court was referencing the garden shed area and parking area.

grass and demarcated by a clear line of bramble and bush. In contrast, *** [p]laintiff's property is undeveloped and wild and overgrown."

¶ 26 Thus, the trial court entered judgment for defendant and against plaintiff on plaintiff's trespass complaint and in favor of defendant and against plaintiff on defendant's counterclaim. This appeal followed.

¶ 27                                    II. ANALYSIS

¶ 28 Plaintiff advances two arguments on appeal. First, plaintiff contends that the trial court erred in determining that defendant's possession of the property was "hostile or adverse." More specifically, plaintiff argues that the court failed to give plaintiff the benefit of the presumption that defendant's use of vacant and unenclosed land was permissive. Second, plaintiff contends that the court erred in determining that defendant's possession of the property was "open and notorious."[2]

¶ 29                    A. Burden of Proof and Standard of Review

_____

[2]At the outset, we note that the parties dispute the scope of plaintiff's challenge to the trial court's ruling. According to defendant, plaintiff challenges only the trial court's finding as to the garden shed area and makes no challenge to the court's finding as to the parking area. Thus, according to defendant, plaintiff has "forfeited" any challenge with respect to the parking area. (Defendant, as a result, confines its arguments to only the garden shed area.) To be sure, in its argument, plaintiff does not address the garden shed area and parking area separately. However, as plaintiff notes in its reply brief, the trial court itself did not distinguish the areas in its ruling. It made a single analysis of the "disputed area." Thus, we find no forfeiture resulting from plaintiff's failure to distinguish the areas.

¶ 30    To acquire title to land by adverse possession, a party must prove that it possessed the land for 20 years and that such possession was (1) continuous; (2) hostile or adverse; (3) actual; (4) open, notorious, and exclusive; and (5) under a claim of title inconsistent with that of the true owner. *Joiner v. Janssen*, 85 Ill. 2d 74, 81 (1981); see also 735 ILCS 5/13-101 (West 2020). "All presumptions are in favor of the title owner, and the party claiming title by adverse possession must prove each element by clear and unequivocal evidence." *Knauf v. Ryan*, 338 Ill. App. 3d 265, 269 (2003). "Because the supreme court has not explained the meaning of 'clear and unequivocal evidence,' courts have applied the clear and convincing burden of proof in adverse possession cases." *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 38 (quoting *Doston v. Former Shareholders of Abraham Lincoln Land & Cattle Co.*, 332 Ill App. 3d 846, 855 (2002)). We will not disturb the trial court's finding of adverse possession unless it is against the manifest weight of the evidence. *Id.* " 'A judgment is against the manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence.' " *Id.* (quoting *Lawlor v. North American Corp. of Illinois*, 2012 IL 112530, ¶ 70). We emphasize that each case in this area presents its own unique set of facts. See *LeSourd v. Edwards*, 236 Ill. 169, 172 (1908) ("It has frequently been said in reference to acts necessary to constitute [adverse] possession that every case must rest upon its own facts[.]").

¶ 31                    B. Hostile or Adverse Possession

¶ 32    To satisfy the "hostile or adverse" element of adverse possession, a claimant need not demonstrate any "actual ill will" between herself and the true property owner but merely an "assertion of ownership incompatible with that of the true owner and all others." *Joiner*, 85 Ill. 2d at 81. Typically, hostility is established by evidence of use and control over the land. *Id.* at 82. Where property is used with the owner's permission, possession is not hostile or adverse. *Mann*

*v. La Salle National Bank*, 205 Ill. App. 3d 304, 310 (1990). "[M]ere permissive use can never ripen into prescriptive right whatever length of time such permissive use is enjoyed." *Monroe*, 376 Ill. at 256. The use of vacant and unoccupied land is presumed to be permissive. *Morris*, 146 Ill. App. 3d at 615.

¶ 33 Plaintiff's sole argument on the element of "hostile or adverse" possession is that the trial court failed to give plaintiff the benefit of the presumption that defendant's use of plaintiff's "vacant and unenclosed" property was permissive. According to defendant, "[b]ecause there was no evidence introduced which indicate[d] that the use of the land was not permissive, the presumption alone [was] sufficient to support a finding that there was no hostile or adverse possession."

¶ 34 Plaintiff directs us to *Diederich v. Walters*, 65 Ill. 2d 95 (1976), for an explanation of "how presumptions operate." In *Diederich*, our supreme court explained that a rebuttable presumption creates "a *[p]rima facie* case as to the particular issue in question and thus has the practical effect of requiring the party against whom it operates to come forward with evidence to meet the presumption." *Id.* at 100. If evidence is introduced that is contrary to the presumption, the presumption will cease to operate, and the issue will be determined based on the evidence adduced at trial as if no presumption had ever existed. *Id.* at 100-01. The burden of proof does not shift but remains with the party who initially benefited from the presumption. *Id.* at 101. The only effect of a rebuttable presumption is to create the necessity of evidence to meet the *prima facie* case created thereby, which will prevail if no proof to the contrary is offered. *Id.* at 102. The court further stated:

"' 'A presumption is not evidence, and cannot be treated as evidence. It cannot be weighed in the scale against evidence. Presumptions are never indulged in against established facts.

They are indulged in only to supply the place of facts. As soon as evidence is produced which is contrary to the presumption which arose before the contrary proof was offered, the presumption vanishes entirely.' [Citations.]" *Id.*

¶ 35 Plaintiff argues that here, although the trial court properly found " '[t]hat [plaintiff's] [p]roperty is vacant and unenclosed,' " the court "abandoned the presumption of permissiveness upon finding that there was no evidence to support the presumption." We disagree with plaintiff's interpretation of the court's ruling as "abandon[ing] the presumption of permissiveness."

¶ 36 Although the trial court could have expressed the point more clearly, the court acknowledged the presumption of permissive use but found that defendant put forth sufficient evidence to rebut the presumption. Specifically, the court found that defendant's use of the property was inconsistent with permissive use, stating that "once the adverse possessor takes steps to visibly carve out a piece of the vacant land with defined boundaries and to use it for a purpose inconsistent with the use of the vacant land, the analysis shifts away from a presumption of permissive use." Plaintiff takes issue with the court's terminology, "shifts away from a presumption." Plaintiff argues that "[t]here are no cases which begin with the presumption and then shift away from the presumption." However, regardless of the court's terminology, it is clear that the court implicitly found that defendant's use of the property was contrary to, and rebutted, the presumption of permissive use. Thus, at that point, as *Diederich* explains, the presumption ceased to operate, and the issue had to be determined based on the evidence adduced at trial, as if no presumption had ever existed. *Id.* at 101. As the trial court noted, plaintiff failed to supply any evidence to support its claim that defendant's use of the property was permissive.

¶ 37 *Monroe*, *Morris*, and *Mann*, on which plaintiff relies, only support the trial court's conclusion. In *Monroe*, the Shrakes sought a prescriptive easement over a roadway that passed

across property owned by Monroe. *Monroe*, 376 Ill. at 254. In finding against a prescriptive easement, the supreme court found that the roadway first passed over Monroe's property when it was vacant, unoccupied, and unenclosed and that, thus, the use of the roadway was presumed permissive. *Id.* at 256. The court found that "[t]here [was] no showing in the record that this permissive use was ever changed into adverse use." *Id.* at 257. The court rejected the Shrakes' argument that the fact that they "worked the road" was proof that they used it "under claim of right." *Id.* The court stated that Shrakes' "up-keep [of the road] does not, in itself, show a claim of right because it [was] consistent with permissive use." *Id.* The court also noted that the Shrakes had agreed with Monroe to pay for use of the road—an arrangement the court found inconsistent with use under a claim of right. *Id.*

¶ 38    In *Morris*, Dunbar (the previous owner of Morris' property) and the Humphreys were adjacent property owners whose properties were separated by a fence installed in about 1916. *Morris*, 146 Ill. App. 3d at 614. The Humphreys acquired their property in 1938 and, since about then, farmed the property up to the fence line; Dunbar's side of the fence was uncultivated. *Id.* In year 17 of the adverse possession statutory period (1955), Dunbar removed the fence. *Id.* The Humphreys continued farming up to the former fence line. *Id.* In September 1973, the Humphreys installed a new fence on the former fence line. *Id.* In 1974, Dunbar removed the fence, destroyed the crops, and placed stakes claiming his boundary line, 80 feet past the former fence line. *Id.* Dunbar told the Humphreys that the property belonged to him. *Id.* Around 1980, after Morris took title, the Humphreys installed a new fence along the former fence line. *Id.* Morris filed an action to quiet title, and the Humphreys defended the action, claiming a right to the disputed property based upon adverse possession. *Id.* at 613.

¶ 39    In finding in favor of Morris, the appellate court found that "[t]he single most significant incident in the entire chain of events occurred in 1955, when Dunbar removed the fence." *Id.* at 615.    Noting that "[t]he use of vacant and unenclosed land is presumed permissive and not adverse," the court found that the Humphreys' farming activity alone, after removal of the fence in 1955, was insufficient to sustain the Humphreys' claim. *Id.*    The court also noted that "[t]he Humphreys' lack of response to Dunbar's actions was inconsistent with the elements of hostility and exclusivity." *Id.* at 616.    The court further noted:

> "The [Humphreys] made no effort to control the land as owners, but passively allowed Dunbar to assert dominion over the land which they claim to have believed belonged to them.    Contrary to their professed state of mind, their behavior strikes us to be that of people who suspected that they were in the wrong and wanted to keep quiet so they could continue to farm the disputed land." *Id.* at 617.

The court concluded that "the proof falls far short of overcoming the presumption in favor of the record titleholder that the use of the disputed land by the [Humphreys] was permissive, rather than adverse." *Id.*

¶ 40    In *Mann*, the property at issue was "an unimproved partial lot" 35 feet wide by about 131 feet long.    *Mann*, 205 Ill. App. 3d at 306.    In 1957, the Naus purchased property adjacent to the 35-foot strip.    *Id.* at 306.    The Naus knew that the strip did not belong to them.    *Id.* at 307. Nevertheless, they excavated and brought it to grade when they built their home.    *Id.*    They used the strip of land as a side yard and planted grass, shrubs, and trees.    *Id.*    The 35-foot strip was purchased in January 1973.    *Id.* at 308.    The evidence showed that the Naus had previously attempted to purchase the strip.    *Id.* at 307.    In May 1981, the Naus sold their property to the

Manns, who also used and maintained the strip of land. *Id.* In 1984, the Manns built a fence around the property. *Id.* In 1987, the Manns brought an action to quiet title to the strip. *Id.* at 306.

¶ 41 The appellate court rejected the Manns' claim of adverse possession, finding that the Naus' and Manns' use of the strip was not hostile or adverse. *Id.* at 308-09. The court stated: "[T]he land in question was essentially an unenclosed vacant lot until 1984 [when the Manns installed the fence]. Therefore, any use of the property by the Manns until 1984 and by the Naus prior to 1981, was presumptively permissive and not adverse." *Id.* at 310. In addition, the court noted that other evidence contradicted the Manns' claim that the use of the strip was hostile—specifically, the Naus' attempt to purchase the property from the owner, which indicated the Naus' recognition of superior title. *Id.* Thus, the court concluded that "the evidence of adverse possession by [the Manns] was insufficient to overcome the presumption in favor of the record titleholder and that the [Manns'] use of the premises was more aptly characterized as permissive rather than adverse." *Id.*

¶ 42 Here, the evidence rebutting the presumption of permissive use was much stronger than the evidence presented in *Monroe*, *Morris*, and *Mann*. Unlike in *Monroe*, defendant's actions on the property were more than the simple "up-keep" of a roadway. And unlike in *Morris*, the evidence showed that defendant did "control the land as owners." As the trial court noted, defendant "carv[ed] out a defined piece of the vacant land and claim[ed] it as her own." Defendant "placed a visible [f]ence, a [s]hed, a lean[-]to and a defined mowed area which is surrounded by a defined wall of 'jungle.' " In addition, defendant

"installed pavers from the door of the [s]hed to the driveway. [Defendant's] husband maintained the area by mowing and trimming the vegetation. After [defendant's] husband died, she hired [Tellez] to perform the maintenance. [Defendant] testified that

> [Grushevski] repaired a portion of the rusted fence. [Defendant] testified that she has used the turn around area to park cars."

Unlike the claimants in *Monroe* and *Morris*, defendant's actions here are inconsistent with permissive use.

¶ 43 *Mann*, too, is readily distinguishable. Although the adverse possessor brought the property to grade and landscaped it, it remained unenclosed and vacant. According to the *Mann* court, the possession did not become adverse until the property was enclosed with a fence. *Mann*, 205 Ill. App. 3d at 309. Here, as already noted, defendant did more than merely landscape and maintain the disputed area. The area was improved with a shed, lean-to, and walkway, and it was also partially bordered by a fence and otherwise "demarcated by a clear line of bramble and bush." Thus, it was effectively separated from the remainder of plaintiff's property. Indeed, "any neighbor viewing the disputed area would assume that the disputed area belonged to *** [d]efendant."

¶ 44 Based on the foregoing, we agree that the particular facts presented here were sufficient to overcome the presumption of permissive use. Accordingly, we conclude that the trial court's finding that defendant's possession of the property was hostile or adverse was not against the manifest weight of the evidence.

¶ 45 C. Open and Notorious Possession

¶ 46 "[T]he test for open and notorious possession is whether the community is *or could be apprised* of the claimant's possession and exclusive use and enjoyment." (Emphasis in original.) *Knauf*, 338 Ill. App. 3d at 271. "The possession should be of such open and visible character as to apprise the world that the property has been appropriated, and is occupied." *Travers v. McElvain*, 181 Ill. 382, 387 (1899).

¶ 47    In *Knauf*, the plaintiffs claimed adverse possession of a strip of property adjacent to the defendants' farmland. *Knauf*, 338 Ill. App. 3d at 266-67. The defendants argued that the adverse possession was not open and notorious and that no one from the community testified that they were aware of the plaintiffs' claim of ownership. *Id.* at 271. The court found in favor of the plaintiffs, stating:

> "[C]ontrary to [the] defendants' assertion, the boundary line [the] plaintiffs claim marks a stark visible contrast in the character of the properties. [The] [p]laintiffs' property is residential, and [the] defendants' property is farmland. The tree line lies in the middle of the strip, and [the] plaintiffs' lawn continues at least up to the stake line, where it is met by a plowed field. Anyone passing by on Woolley Road most likely would assume that the landscaped strip east of the stake line is a part of [the] plaintiffs' residential property." *Id.*

¶ 48    Plaintiff argues that the open and notorious element was not met here, because the trial court found that the shed was only "slightly visible" and that a person would not see it unless he or she was "actively looking" for it.

¶ 49    First, we note that the trial court's description of the shed as "slightly visible" after the buckthorn lost its leaves in late fall or early winter was made only in reference to the shed "*as viewed from St. Mary's Road*." (Emphasis added.) The court made the additional finding that, when "standing at the mailbox instead of the roadway" in late fall or winter, "the disputed area *can be seen from a public area*" (emphasis added), *i.e.*, the public right of way at the mailbox. To be sure, the *Knauf* court found that the possession was open and notorious because anyone passing by on the road would assume the disputed property belonged to the adverse claimant. However, as defendant notes, the test for determining open and notorious possession is whether a community member "is or *could be apprised*" of defendant's use of the property. Here, a community member

standing on the public right of way could see the shed in the late fall, winter, and early spring months. In addition, the court noted Milan's testimony that, when he walked the southern edge of his property, he was able to see the shed. Indeed, had Milan done so since 1991, he would have seen the shed. The court also noted Pinter's testimony that the shed was visible from Pinter's property.

¶ 50    Plaintiff also argues that, unlike in *Knauf*, the trial court here did not describe "a stark visible contrast between properties." We disagree. The court expressly stated:

> "The area by the carve out is nicely mowed with cultivated and manicured green grass and demarcated by a clear line of bramble and bush. In contrast, *** [p]laintiff's property is undeveloped and wild and overgrown."

Accordingly, the court found that "any neighbor viewing the disputed area would assume that the disputed area belonged to *** [d]efendant."

¶ 51    Accordingly, based on the particular facts presented here, we conclude that the trial court's finding that defendant's possession of the property was open and notorious was not against the manifest weight of the evidence.

¶ 52                                III. CONCLUSION

¶ 53    For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 54    Affirmed.